**MARTIN WEINBERG, ESQUIRE**
WEI-035
ASB 0817-A61W
P.O. Box 154, Shannon, AL 35142-0154
205.910.3722 | attorneyweinberg@bellsouth.net
*Co-Counsel for the Plaintiffs*

**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. ID: 89182
JACOB LITIGATION
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
*Co-Counsel for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA (Northeastern Division)

| | |
|---|---|
| **DOROTHY NELSON, individually,** | : No.: 5:18-cv-00059-HNJ |
| **and as the Administrator Ad Litem of the** | : |
| **ESTATE OF RANDY NELSON,** | : |
| **Plaintiff,** | : |
| | : **CIVIL ACTION – LAW** |
| **v.** | : **JURY TRIAL DEMANDED** |
| | : |
| **GREGG LOTT,** | : |
| **DUSTY MEADOWS,** | : |
| **CITY OF ATHENS, ALABAMA, and** | : |
| **HUNTSVILLE HOSPITAL HEALTH SYSTEM** | : |
| **d/b/a ATHENS-LIMESTONE HOSPITAL,** | : |
| **Defendants.** | : |

## SECOND AMENDED COMPLAINT

**AND NOW** comes the Plaintiff, DOROTHY NELSON, individually, and as the

Administrator Ad Litem of the ESTATE OF RANDY NELSON, by and through her

undersigned counsel, MARTIN WEINBERG, ESQUIRE; and DEVON M. JACOB,

ESQUIRE, of JACOB LITIGATION, INC.; and avers as follows:

## I.  JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983.

2.     Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343 & 1367.

3.     Venue is proper in this Court, as all Defendants are located within the Northern District of Alabama, and the cause of action arose in the District of Northern District of Alabama.

## II.     PARTIES

4.     Plaintiff, DOROTHY NELSON (hereinafter "DOROTHY"),[1] is the biological mother of the decedent, RANDY NELSON, and is the duly appointed Administrator Ad Litem of the ESTATE OF RANDY NELSON ("ESTATE"). Plaintiff DOROTHY is an adult, who currently resides in Athens, Limestone County, Alabama.

5.     Defendant, GREGG LOTT (hereinafter "LOTT"), is an adult individual, who, during all relevant times, was employed by the City of Athens, Alabama, as a police officer. All of Defendant LOTT'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

6.     Defendant, DUSTY MEADOWS (hereinafter "MEADOWS"), is an adult individual, who, during all relevant times, was employed by the City of Athens,

---

[1] Since there are two parties with the same last name, to avoid confusion, these persons will be referred to by first name.

Alabama, as a police officer. All of Defendant MEADOWS' actions or inactions were taken under color of state law. He is sued in his individual capacity.

7.      Defendant, CITY OF ATHENS, ALABAMA (hereinafter "CITY") has a municipal government comprised of an elected mayor and five members of a city council. The City of Athens is located in Limestone County, Alabama. The Defendant CITY owns and operates the Athens Police Department, which is also located in Limestone County, Alabama, and which during all relevant times, employed the Individual Defendants.

8.      Defendant, HUNTSVILLE HOSPITAL HEALTH SYSTEM d/b/a ATHENS-LIMESTONE HOSPITAL (hereinafter "HOSPITAL") is located at 700 West Market Street, Athens, Limestone County, Alabama 35611.

**III.   MATERIAL FACTS**

    **a. RANDY was "otherwise qualified" to be treated for "anorexic with extremely poor oral intake."**

9.      On February 3, 2016, DOROTHY NELSON transported her son, RANDY NELSON, to the HUNTSVILLE HOSPITAL HEALTH SYSTEM d/b/a ATHENS-LIMESTONE HOSPITAL, 700 West Market Street, Athens, Limestone County, Alabama 35611.

10.     RANDY presented in the emergency department of the Defendant HOSPITAL for medical treatment for "anorexic with extremely poor oral intake."

3

**b. RANDY denied medical care for "anorexic with extremely poor oral intake."**

11.     RANDY was a 49 year old male who was known to suffer from chronic mental illness, having been previously diagnosed with schizophrenia and bipolar disorder, and having been approved to receive social security disability.

12.     Medical personnel of Defendant HOSPITAL initially offered to treat RANDY's chief complaint of "anorexic with extremely poor oral intake."

13.     As a result of RANDY'S schizophrenia and bipolar disorder, RANDY became afraid.

14.     Despite the fact that no medical or safety issue prevented them from doing so, medical personnel of Defendant HOSPITAL did not summon a mental health professional to the Emergency Department or provide RANDY with time in which to calm himself.

15.     Instead, medical personnel of Defendant HOSPITAL decided that as a condition precedent to receiving medical treatment for "anorexic with extremely poor oral intake," RANDY had to first consent to injections of sedating medications.

16.     The intended injections were not medically necessary to treat a life-threatening medical condition or to treat "anorexic with extremely poor oral intake."

17.     As a result of his schizophrenia and bipolar disorder, RANDY became even more fearful of the medical personnel when they attempted to administer the injections.

18.     When medical personnel attempted to administer the injections, RANDY waived his arms slowly to clearly communicate to them that he did not consent to the injections.

19.     In response, medical personnel of Defendant HOSPITAL ceased providing RANDY with medical treatment for "anorexic with extremely poor oral intake," and instead began to treat RANDY like a criminal.

20.     Specifically, medical personnel from Defendant HOSPITAL summoned police officers from the Athens City Police Department to Defendant HOSPITAL to address RANDY'S refusal to consent to receiving the injections that they were requiring.

### c. An Unlawful Use of Force Caused RANDY'S Death

21.     When Defendants, LOTT and MEADOWS, arrived at the Defendant HOSPITAL, RANDY was calmly sitting on the hospital bed.

22.     Medical personnel of Defendant HOSPITAL jokingly advised Defendants, LOTT and MEADOWS, "It's just more than we can handle to hold him and I just need a strong back and a weak mind."

23.     Despite having time to speak with medical personnel and to deliberate, Defendants, LOTT and MEADOWS, did not inquire as to whether the injection was medically necessary to treat a life-threatening medical condition.

24.     Defendants, LOTT and MEADOWS, knew that RANDY had not engaged in criminal activity, and that no exigency – medical or otherwise – required them to act.

25.     Regardless, Defendants, LOTT and MEADOWS, agreed to confront RANDY about his refusal to consent to the injections, with the intent of physically forcing him to do so.

26.     The unlawful force used by Defendants, LOTT and MEADOWS, to unlawfully detain RANDY for the purpose of forcing him to consent to the injections, and the reasonable force used by RANDY in self-defense, was captured on Defendant MEADOWS' body camera. See Video, Exhibit 1.

27.     When RANDY did not consent to the injections, Defendants, LOTT and MEADOWS, provoked a violent confrontation with RANDY, by attempting, unsuccessfully, to physically restrain him for the sole purpose of permitting medical personnel to inject RANDY without his consent.

28.     Defendants, LOTT and MEADOWS', conduct exacerbated the situation by instigating the need for further physical force, instead of deescalating the situation.

29.     Having already been subject to an unlawful use of force, RANDY became even more fearful for his personal safety.

30.     To protect himself from further assault, RANDY swung his arms, and flung a small vial of medication toward Defendants, LOTT and MEADOWS.

31.     It is clear from the video that RANDY never presented as a credible threat to either Defendants, LOTT or MEADOWS, or to any of the other persons present.

32.     Likewise, it is clear from the video that neither Defendants, LOTT nor MEADOWS, perceived RANDY to be a threat to themselves or others, as Defendants, LOTT and MEADOWS, did not immediately respond to RANDY'S actions.

33.     Rather, Defendant LOTT held a calm conversation with medical personnel and DOROTHY regarding the fact that he intended to use a TASER on RANDY.

34.     During this conversation, there was no discussion regarding whether or not DOROTHY could lawfully consent to the injections or to the use of force on RANDY'S behalf.

35.     Regardless, Defendants, LOTT and MEADOWS, never informed medical personnel or DOROTHY of the medical risks associated with the use of a TASER on an obviously physically unhealthy, disabled, middle-aged male.

36.     As such, Defendants, LOTT and MEADOWS, knew that even if medical personnel or DOROTHY could consent to the use of force against RANDY, any such consent would not be informed and valid consent.

37.     Moreover, Defendants, LOTT and MEADOWS, knew that under no circumstance, could medical personnel or DOROTHY consent to an unlawful use of force against RANDY.

38.     Despite the fact that RANDY did not present as a danger to himself or others, and there was no medical or other exigency requiring RANDY to be immediately restrained, instead of (a) waiting for RANDY to calm himself, (b) summoning mental health personnel to assist, or (c) attempting to calmly speak further with RANDY, Defendants, LOTT and MEADOWS, immediately escalated their use of force.

39.     Defendant LOTT pulled out his Taser, pointed the Taser at RANDY, and threatened to deploy the Taser into RANDY.

40.     Despite having an appreciable opportunity to intervene, Defendant MEADOWS did not explain to Defendant LOTT that he did not have a lawful basis to detain RANDY or to use force against him.

41.     Defendant MEADOWS did not instruct Defendant LOTT to put his TASER away, or physically intervene to protect RANDY from Defendant LOTT.

42.     Defendant LOTT deployed his TASER, in dart mode, into RANDY'S back, and activated it, causing RANDY to fall in an uncontrolled manner to the ground.

43.     Again, despite an appreciable opportunity to intervene, Defendant MEADOWS watched while Defendant LOTT repeatedly cycled the TASER.

44.     Defendant LOTT repeatedly cycled the TASER because RANDY purportedly refused to comply with orders to submit to handcuffing.

45.     As a result of the effect of the repeated cycling of the TASER, however, it was not physically possible for RANDY to comply with the orders to submit to handcuffing.

46.     The repeated cycling of the TASER, and the associated use of force, caused RANDY to go into respiratory and cardiac arrest.

47.     In the alternative, the repeated cycling of the TASER, and the associated use of force, caused RANDY to suffer "Excited Delirium" (discussed further below), which caused RANDY to go into respiratory and cardiac arrest.

48.     Resuscitation was initially successful, however, RANDY had already sustained fatal injuries.

49.     On February 8, 2016, RANDY died as a result of those injuries.

   **d. Autopsy**

50.    On February 9, 2016, the state medical examiner conducted an autopsy, in which she concluded:

> **Cause of Death:** Excited Delirium Associated With Mental Illness and Therapeutic Medications.
>
> **Contributory:** Hypertensive Cardiovascular Disease, Obesity and Physical Exertion.
>
> **Manner:** Accident

51.    In the event that it is ultimately determined that "Excited Delirium"[2] is a correct cause of death, Defendants, LOTT and MEADOWS, unlawfully caused RANDY to suffer the Excited Delirium, which ultimately caused his death.

### e. The TASER

52.    AXON, during the relevant time, TASER International ("TASER®"), is engaged in the business of manufacturing, distributing and selling electrical control devices ("ECDs") to law enforcement agencies throughout the United States, as well as replacement cartridges for the continuing use of said products.

53.    In connection with the original sale, TASER® provides training, and training materials, to law enforcement agencies to use in instructing their officers in the proper use of its products.

---

[2] Excited delirium is a highly controversial diagnosis. While it is recognized by the National Association of Medical Examiners and the American College of Emergency Physicians, it is not recognized by the Diagnostic and Statistical Manual of Mental Disorders or by the American Medical Association. See https://www.texasobserver.org/excited-delirious-dead/.

54. It is believed that discovery will reveal, and therefore averred:

a. That TASER® became aware that its products could cause a negative effect on a person's heart, i.e., capture, pacing, rate, and/or rhythm, and warned the Defendant CITY accordingly.

b. That TASER® became aware that its products could cause fibrillation, tachycardia, and/or cardiac arrest, and warned the Defendant CITY accordingly.

c. That TASER® products can also have a negative effect on neuropathological mechanisms.

d. That the electrical current from a TASER can overload the brain electrically to the point that it cannot compensate adequately for the sudden surge in energy.

e. That as a result, the neurons of the brain begin to misfire, creating mechanoporation, which is the brain's equivalent of ventricular fibrillation.

f. That essentially, the brain shuts off, and in doing so, shuts off all other systems of the body, including the heart and lungs.

g. That the TASER is designed to shut off after a preprogrammed amount of time (5 second cycle).

h.     That the TASER, however, is designed so that the preprogrammed amount of cycle time can easily be overridden by the user, and unlimited additional 5 second bursts can be administered to the target (which occurred in this incident).

i.     That the TASER is designed to affect the sensory and motor nervous systems, overriding the central nervous system, causing uncontrollable muscle contractions that make it physically impossible for a person exposed to the TASER to not respond to its effects.

j.     That TASER® warned its customers, including the Defendant CITY, that reasonable efforts should be made to minimize the number of ECD exposures.

k.     That TASER® warned its customers, including the Defendant CITY, that ECD users should (a) use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives, and (b) reassess the subject's behaviors, reactions, and resistance level before initiating or continuing the exposure.

l.     That TASER® warned its customers, including the Defendant CITY, that if a subject is non-compliant after a number of ECD exposures, consideration should be given to whether alternative control measures in conjunction with or separate from the ECD are appropriate under the circumstances.

m.     That TASER® warned its customers, including the Defendant CITY, that there is an increased risk of death when a TASER is used on an infirm person, or a person who is in an emotional or mental health crisis.

### f. The Defendant CITY'S Deficient Policies and Training Caused the Constitutional Injury.

55.     Defendant CITY ignored TASER®'S warning that the TASER, even when properly used, can cause death, and failed to adopt a proper policy and provide proper training to all officers governing its use.

56.     In the alternative, Defendants, LOTT and MEADOWS, ignored the Defendant CITY'S TASER policy and related training.

57.     Defendant CITY ignored TASER®'s warning that the repeat cycling of the TASER and/or prolonged exposure to the TASER increases the risk of death, and failed to adopt a proper policy and provide proper training to all officers governing its use.

58.     In the alternative, Defendants, LOTT and MEADOWS, ignored the Defendant CITY'S TASER policy and related training.

59.     Defendant CITY ignored TASER®'s warning that there is an increased risk of death when using a TASER on persons who suffer from mental illness, and failed to adopt a proper policy and provide proper training to all officers governing its use.

13

60.     In the alternative, Defendants, LOTT and MEADOWS, ignored the Defendant CITY'S TASER policy and related training.

61.     Defendant CITY ignored TASER®'s warning that there is an increased risk of death when using a TASER on persons who are being physically restrained on their stomachs, on a hard surface, while being handcuffed behind their back, and failed to adopt a proper policy and related training for all officers governing its use.

62.     In the alternative, Defendants, LOTT and MEADOWS, ignored the Defendant CITY'S TASER policy and related training.

63.     The TASER'S electrical current causes severe muscle contractions, which in turn, cause the muscles to secrete lactic acid into the blood.

64.     If the body cannot compensate for the increasing metabolic acidosis, cardiac arrest will occur.

65.     The Defendant CITY has an established policy, practice, or custom of permitting all officers to use a TASER on subjects who do not present as a credible threat to themselves or others.

66.     In the alternative, Defendants, LOTT and MEADOWS, violated the Defendant CITY'S use of force policy, by using a TASER against RANDY when he did not present as a credible threat to himself or others.

67.     It is believed that discovery will reveal, and therefore averred, that the Defendant CITY failed to issue appropriate discipline and corrective training to any officer who violated the aforementioned policies and training.

68.     The Defendant CITY'S aforementioned failures created, encouraged, enforced, and maintained a culture where excessive force was permitted and expected.

IV.     **LEGAL CLAIMS**

**COUNT I**

**Plaintiff Estate v. Defendants, Lott and Meadows**
**Fourth Amendment – Excessive Force**
**(pursuant to 42 U.S.C. § 1983)**

69.     Paragraphs 1 through 68 are stated herein by reference.

70.     Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

71.     To determine "objective reasonableness," while not dispositive, Courts may consider state and federal law, and whether the officer acted in accordance with policies and training.

72.     The Fourth Amendment does not provide police officers with a privilege to use force to compel a patient, in a hospital, to consent to the administration of sedating medication in non-emergency situations.

73.     Neither the Fourth Amendment nor Alabama state law permits officers to

use excessive force while performing discretionary activities.

74. The Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause. See Borders v. City of Huntsville, 875 So.2d 1168, 1180 (Ala. 2003); 1975 Ala. Code § 6-5-338.

75. Moreover, pursuant to 1975 Ala. Code § 13A-3-27, officers are liable if they use more than a reasonable amount of force in making an arrest, and citizens are liable if they use more than a reasonable amount of force in protecting another person.

76. Defendants, LOTT and MEADOWS, knew that there was no crime even arguably committed by RANDY when he ignored their commands to consent to the injections for which they would have had arguable probable cause to seize RANDY; yet they used force anyway to seize him. Cf. 1975 Ala. Code § 32-5A-4 (directing that no person "willfully" refuse to comply with a "lawful" order of someone with the authority to regulate traffic); Sly v. State, 387 So.2d 913, 915 (Ala. Cr. App. 1980) (noting that the statute requiring obedience of lawful traffic orders "Was not intended to, does not, and cannot give police officers unbridled power to arrest for refusal to obey any order they may choose to direct at a citizen").

77.     Despite the fact that the Defendants, LOTT and MEADOWS, were not presented with the threat of serious injury or death, they provoked the need to use force, and in fact used excessive force against RANDY, causing fatal injuries.

78.     At the time when the force was used, RANDY did not present as a credible threat to himself or others, and RANDY had not committed any crimes.

79.     As such, RANDY was lawfully permitted to use reasonable force to defend himself against the unlawful force that Defendants, LOTT and MEADOWS, used, or intended to use, against him.

80.     The use of a TASER merely to obtain behavior compliance is not lawful and not in accordance with accepted police practices.

81.     Moreover, Defendants, LOTT and MEADOWS, knew or should have known that as a result of the TASER'S activation, RANDY could not comply with their commands.

82.     Therefore, multiple ECD cycles or five (5) seconds of discharge cannot be legally justified solely on the basis that RANDY allegedly failed to comply with Defendants, LOTT and MEADOWS', commands.

83.     (Pleading in the alternative) it is believed and therefore averred that discovery will establish that Defendants, LOTT and MEADOWS, violated the Defendant CITY'S policies and procedures.

84.     (Pleading in the alternative), it is believed and therefore averred that discovery will establish that Defendants, LOTT and MEADOWS, violated the Defendant CITY'S training.

85.     The force used by Defendants, LOTT and MEADOWS, against RANDY was not objectively reasonable and violated clearly established state and federal law.

86.     Defendants, LOTT and MEADOWS, engaged in their conduct with a complete disregard for the value of RANDY'S life.

87.     As a direct and proximate cause of Defendants, LOTT and MEADOWS', actions, RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

88.     Plaintiff Estate seeks compensatory and punitive damages, attorneys' fees, litigation costs, interest and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 1983.

## COUNT II

**Plaintiff Estate v. Defendant Meadows**
**Fourth/Fourteenth Amendments – Failure to Intervene**
**(pursuant to 42 U.S.C. § 1983)**

89.     Paragraphs 1 through 68 are stated herein by reference.

90.     "[A]n officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]") (alterations in original) (citing Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998)).

91.     Despite having an appreciable opportunity to intervene, Defendant MEADOWS did not explain to Defendant LOTT that he did not have a lawful basis to detain RANDY or to use force against him.

92.     Defendant MEADOWS did not instruct Defendant LOTT to put his TASER away, or physically intervene to protect RANDY from Defendant LOTT.

93.     Despite an appreciable opportunity to intervene, Defendant MEADOWS watched while Defendant LOTT shot the TASER into RANDY'S back and repeatedly cycled the TASER.

94.     As a direct and proximate cause of Defendant LOTT'S actions, RANDY

suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

95.    Plaintiff Estate seeks compensatory and punitive damages, attorneys'
fees, litigation costs, interest and any other relief available pursuant to Alabama State
law and/or 42 U.S.C. § 1983.

## COUNT III

**Plaintiff Estate v. Defendant City of Athens**
**Fourth/Fourteenth Amendments – Municipal Liability**
**(pursuant to 42 U.S.C. § 1983) (Monell Claim)**

96.    Paragraphs 1 through 68 are incorporated herein by reference.

97.    "Local governing bodies . . . can be sued directly under § 1983 for
monetary, declaratory, or injunctive relief where . . . the action that is alleged to be
unconstitutional implements or executes a policy statement, ordinance, regulation, or
decision officially adopted and promulgated by that body's officers." Monell v. Dep't
of Soc. Servs., 436 U.S. 658, 690 (1978).

98.    In addition, a failure to train may give rise to municipal liability, if
the failure to train amounts to "deliberate indifference to the rights of persons with
whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378,
388 (1989).

99.    Policymakers of the Defendant CITY participated in, authorized, and/or
acquiesced in, the unlawful conduct discussed herein; adopted, implemented, and/or

enforced, policies and practices that did not comport with state and federal law; and/or failed to adopt, implement, and/or enforce, policies and practices that comport with state and federal law.

100.   The Defendant CITY maintained policies, practices, and customs, which were the moving force that resulted in RANDY'S constitutional rights being violated.

101.   The Defendant CITY knew that its police officers would regularly be in contact with persons who suffered from mental illness, but failed to adopt proper policies and/or provide officers with proper training on the Americans with Disabilities Act.

102.   The Defendant CITY knew that its police officers would regularly be called to assist medical personnel in medical facilities, but failed to adopt proper policies or provide officers with proper training regarding the scope of their authority to compel medical treatment, which resulted in RANDY'S constitutional and statutory rights being violated.

103.   The Defendant CITY knew that its police officers would regularly be in contact with persons wherein they would need to decide whether or not the use of force was lawful, but failed to adopt proper policies or provide officers with proper training regarding Alabama state law and a citizen's right to use reasonable force in self-defense.

104. The Defendant CITY was on notice of physiological changes that occur in the human body as a result of being subjected to the use of a TASER, but failed to adopt proper policies or provide officers with proper training regarding the physiological changes, which resulted in RANDY'S constitutional and statutory rights being violated.

105. The Defendant CITY was on notice of tactical adjustments and considerations required to accommodate life-threatening physiological changes that occur in the human body as a result of being subjected to the use of a TASER, but failed to adopt proper policies or provide officers with appropriate training regarding the tactical adjustments and considerations, which resulted in RANDY'S constitutional and statutory rights being violated.

106. The Defendant CITY failed to implement an effective process to ensure that policies and training of the Defendant CITY were followed by its police officers.

107. It is believed that discovery will reveal, and therefore averred, that when it has been determined that officers have violated the constitutional or statutory rights of persons, or used unlawful force against persons, or when police officers have been named in citizen complaints, or when the Defendant CITY has settled civil lawsuits, the Defendant CITY has not required police officers to receive corrective or additional training.

108. It is believed that discovery will reveal, and therefore averred, that the Defendant CITY did not follow its internal affairs policy and properly investigate, discipline, or retrain Defendants, LOTT and MEADOWS, for the conduct discussed in this Complaint.

109. If it is ultimately determined that an internal affairs investigation occurred, it is believed that discovery will reveal, and therefore averred, that the investigation was triggered as a result of a threat of civil litigation (so as to be a defense to the litigation), as opposed to when the Defendant CITY first learned of the incident discussed herein.

110. As a direct and proximate cause of the Defendant CITY'S actions, RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

111. Plaintiff Estate seeks compensatory damages, attorneys' fees, litigation costs, interest and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 1983.

## COUNT IV

**Plaintiff Estate v. Defendant City of Athens**
**Violation of Title II of the Americans with Disabilities Act ("ADA")**
**(pursuant to 42 U.S.C. § 12131, et seq.)**

112. Paragraphs 1 through 68 are incorporated herein by reference.

113.   Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

114.   In order to state a claim pursuant to Title II of the ADA, a Plaintiff must allege that: (1) the subject of the discrimination was a qualified individual with a disability, (2) that he or she was discriminated against by a public entity, and (3) that the discrimination was due to the disability. See, e.g., Suarez v. City of Hollywood, No. 16-62215, 2016 WL 8738228, at *3 (S.D. Fla. Dec. 5, 2016) (Dimitrouleas, J.).

115.   In addition, "[t]o prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." McCullum v. Orlando Reg'l Healthcare Sys., 768 F.3d 1135, 1146-47 (11th Cir. 2014) (citations omitted).

116.   The Defendant, CITY, provides police services to the general public in Limestone County, Alabama.

117.   It is believed, and therefore averred, that Defendant CITY provides these public services with the assistant of federal funding.

118.   Defendants, LOTT and MEADOWS, knew that RANDY suffered from a qualifying disability – schizophrenia and bipolar disorder.

119.   RANDY, however, did not present at the Defendant HOSPITAL for treatment of schizophrenia and bipolar disorder.

120.   Rather, RANDY presented at Defendant HOSPITAL for treatment of "anorexic with extremely poor oral intake."

121.   Probable cause did not exist to arrest RANDY for any crime, or for purposes of placing him in protective custody.

122.   As such, the use of force against RANDY, let alone excessive and unlawful force that included the use of a TASER, was neither necessary nor lawful.

123.   Defendants, LOTT and MEADOWS, joked with medical personnel employed by Defendant HOSPITAL about the situation presented by RANDY'S medical symptoms; evidencing a callous disregard for RANDY'S emotional wellbeing, and a discriminatory motive toward his disability.

124.   A non-disabled citizen would not have been subjected to a use of force by police officers employed by the Defendant CITY for refusing an instruction to consent to an injection.

125.   Rather, if police officers employed by the Defendant CITY responded to a call requesting their assistance, a non-disabled person would be protected by the officers from persons (including police officers) intending to use unlawful force against them.

126. Defendants, LOTT and MEADOWS, had time to deliberate and consider their options, including whether or not they were lawfully permitted to use force to compel RANDY to consent to injections.

127. Police officers employed by the Defendant CITY do not assist medical personnel in hospitals in providing medical care to non-disabled patients in non-life threatening situations.

128. Police officers employed by the Defendant CITY do not address non-disabled patients' refusal to consent to receiving injections of sedating medications with a use of force.

129. As a direct and proximate cause of the Defendant CITY'S actions, RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

130. Plaintiff Estate seeks compensatory and punitive damages, attorneys' fees, litigation costs, interest and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 12132.

## COUNT V

**Plaintiff Estate v. Defendant City of Athens**
**Violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act")**
**(pursuant to 29 U.S.C. § 794)**

131. Paragraphs 1 through 68 are incorporated herein by reference.

132. Pursuant to the Rehabilitation Act, no "qualified individual with a disability . . . shall, solely by reason of his or her disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794.

133. In order to state a claim pursuant to Section 504 of the Rehabilitation Act, a Plaintiff must allege that: (1) the subject of the discrimination was a qualified individual with a disability, (2) that he or she was discriminated against by a public entity, and (3) that the discrimination was due to the disability. See, e.g., Suarez v. City of Hollywood, No. 16-62215, 2016 WL 8738228, at *3 (S.D. Fla. Dec. 5, 2016) (Dimitrouleas, J.).

134. In addition, "[t]o prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." McCullum v. Orlando Reg'l Healthcare Sys., 768 F.3d 1135, 1146-47 (11th Cir. 2014) (citations omitted).

135. Paragraphs 116 through 128 are incorporated herein by reference.

136. As a direct and proximate cause of the Defendant CITY'S actions, RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

137. Plaintiff Estate seeks compensatory and punitive damages, attorneys'

fees, litigation costs, interest and any other relief available pursuant to Alabama State law and/or 29 U.S.C. § 794.

**COUNT VI**

**Plaintiff Estate v. Defendant Hospital**
**Violation of Title II or Title III of the Americans with Disabilities Act ("ADA")**
**(pursuant to 42 U.S.C. § 12131, et seq., and 42 U.S.C. § 12181, et seq.)**

138. Paragraphs 1 through 68 are incorporated herein by reference.

139. Defendant HOSPITAL must comply with the Americans with Disabilities Act, either Title II – governing private hospitals, or Title III – governing public hospitals.

140. Title II of the ADA and § 504 of the Rehabilitation Act "forbid discrimination on the basis of disability in the provision of public services." J.S., III v. The Houston Cnty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017).

141. To state a claim under the ADA or the Rehabilitation Act, Plaintiff must establish (1) that RANDY was a "qualified individual with a disability," (2) that he was excluded from participation in, or denied the benefits of, the hospital's services, programs, or activities, or was otherwise discriminated against, and (3) that the discrimination was by reason of his disability. See, e.g., J.S., III v. Houston Cnty. Bd., 877 F.3d at 985; Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007).

142.   It is believed, and therefore averred, that Defendant HOSPITAL receives federal funding.

143.   Defendant HOSPITAL offers emergency medical care to the general public in Limestone County, Alabama.

144.   Medical personnel employed by Defendant HOSPITAL knew that RANDY suffered from a qualifying disability – schizophrenia and bipolar disorder.

145.   RANDY, however, did not present at the Defendant HOSPITAL for treatment of schizophrenia and bipolar disorder.

146.   Rather, RANDY presented at Defendant HOSPITAL for treatment of "anorexic with extremely poor oral intake."

147.   Medical personnel employed by Defendant HOSPITAL joked about the situation presented by RANDY'S medical symptoms; evidencing a callous disregard for RANDY'S emotional wellbeing, and a discriminatory motive toward his disability.

148.   It is believed, and therefore averred, that discovery will establish that a non-disabled patient of Defendant HOSPITAL who becomes agitated and fearful during a medical examination, is not required to receive forced injections of sedating medications, as a condition for receiving treatment of "anorexic with extremely poor oral intake."

149. Requiring RANDY to receive forced injections of sedating medications, because he suffered from schizophrenia and bipolar disorder, before agreeing to treat his "anorexic with extremely poor oral intake," is a *de facto* denial of medical care.

150. It is further believed, and therefore averred, that discovery will establish that medical personnel of Defendant HOSPITAL do not summon law enforcement officers assist in providing medical care to any non-disabled patients in non-life threatening situations.

151. It is further believed, and therefore averred, that discovery will establish that in non-life threatening situations, medical personnel of Defendant HOSPITAL do not summon law enforcement officers to address non-disabled patients' refusal to consent to receiving injections of sedating medications with a use of force.

152. It is further believed, and therefore averred, that discovery will establish that medical personnel of Defendant HOSPITAL do not permit law enforcement personnel to physically assault and kill non-disabled patients.

153. The Defendant HOSPITAL discriminated against RANDY, when medical personnel in its employ invited law enforcement personnel to assault and kill him but not other non-disabled patients.

154. As a direct and proximate cause of Defendant, HOSPITAL'S actions, RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and

death.

155.   Plaintiff Estate seeks compensatory and punitive damages, attorneys'
fees, litigation costs, interest and any other relief available pursuant to Alabama State
law and/or 42 U.S.C. § 12132.

## COUNT VII

**Plaintiff Estate v. Defendant Hospital**
**Violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act")**
**(pursuant to 29 U.S.C. § 794)**

156.   Paragraphs 1 through 68 are incorporated herein by reference.

157.   Title II of the ADA and § 504 of the Rehabilitation Act "forbid
discrimination on the basis of disability in the provision of public services." J.S., III v.
The Houston Cnty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017).

158.   To state a claim under the ADA or the Rehabilitation Act, Plaintiff must
establish (1) that RANDY was a "qualified individual with a disability," (2) that he was
excluded from participation in, or denied the benefits of, the hospital's services,
programs, or activities, or was otherwise discriminated against, and (3) that the
discrimination was by reason of his disability. See, e.g., J.S., III v. Houston Cnty. Bd.,
877 F.3d at 985; Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007).

159.   Paragraphs 142 through 153 are incorporated herein by reference.

160.   As a direct and proximate cause of Defendant, HOSPITAL'S, actions,

RANDY suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

161.   Plaintiff Estate seeks compensatory and punitive damages, attorneys' fees, litigation costs, interest and any other relief available pursuant to Alabama State law and/or 29 U.S.C. § 794.

## COUNT VIII

**Plaintiffs v. Defendants**
**Wrongful Death**
**(Pursuant to Alabama Code §6-5-410)**

162.   Paragraphs 1 through 68 are stated herein by reference.

163.   There were no actions brought by the decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

164.   RANDY died intestate.

165.   The Defendants used excessive force, or permitted excessive force to be used, against RANDY, when he refused to consent to an injection of medication.

166.   When RANDY used reasonable force in self-defense, the Defendants increased the level of force, or permitted an increased level of force to be used against RANDY, causing RANDY to suffer fatal injuries.

167.   As a direct and proximate cause of the Defendants' wrongful acts, RANDY suffered an untimely death.

168.     Therefore, Plaintiff asserts this claim against the Defendants to recover all damages permitted by Alabama Code §6-5-410.

**WHEREFORE,** Plaintiffs respectfully request that judgment be entered in their favor as follows:

a.     That this Court declare that the Defendants' actions violated RANDY and her constitutional and statutory rights;

b.     Compensatory damages including but not limited loss of companionship, comfort, financial support, and guidance caused by the death; and the survivor's emotional suffering.

c.     Punitive damages (except against the Defendant City on the Monell claim);

d.     Reasonable attorney's fees and costs; and

e.     Such other financial or equitable relief as is reasonable and just.

## V.     <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

**/s Devon M. Jacob**                 **Date: April 27, 2018**

**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com


**/s Martin Weinberg**                 **Date: April 27, 2018**

**MARTIN WEINBERG, ESQUIRE**
WEI-035
P.O. Box 154, Shannon, AL 35142-0154
205.910.3722 | attorneyweinberg@bellsouth.net

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA (Northeastern Division)**

| | |
|---|---|
| **DOROTHY NELSON, individually,** | : No.: 5:18-cv-00059-HNJ |
| **and as the Administrator Ad Litem of the** | : |
| **ESTATE OF RANDY NELSON,** | : |
| Plaintiff, | : |
| | : CIVIL ACTION – LAW |
| v. | : JURY TRIAL DEMANDED |
| | : |
| **GREGG LOTT, at al.,** | : |
| Defendants.: | |

---

### CERTIFICATE OF SERVICE

---

I hereby certify that on the date listed below, I electronically filed the foregoing with the Court using the CM/ECF system. In addition, I emailed the foregoing to the following persons:

David J. Canupp, Esquire
Email: DJC@LanierFord.com

Daniel F. Beasley, Esquire
Email: dbeasley@lfsp.com


**DEVON M. JACOB, ESQUIRE**                          **Date:  April 27, 2018**