IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA (Northeastern Division)

| | |
|---|---|
| **DOROTHY NELSON, individually,** : | No.: 5:18-cv-00059-HNJ |
| and as the Administrator Ad Litem of the : | |
| **ESTATE OF RANDY NELSON,** : | |
| **Plaintiff,** : | |
| : | CIVIL ACTION – LAW |
| v. : | JURY TRIAL DEMANDED |
| : | |
| **GREGG LOTT, at al.,** : | |
| **Defendants.**: | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO
### DEFENDANTS' LOTT AND MEADOWS' MOTION TO DISMISS

## I.  Procedural History

On January 12, 2018, Plaintiff filed a Complaint (Doc. 1). On January 16, 2018, Plaintiff filed an Amended Complaint (Doc. 3). On April 27, 2018, Plaintiff filed a Second Amended Complaint (Doc. 34).[1]

On May 11, 2018, the Defendants filed motions to dismiss: Defendants, Lott and Meadows (Doc. 42), Defendant, City (Doc. 43), and Defendant, Hospital (Doc.

---

[1] During the conference call on March 29, 2018, undersigned counsel informed the Court and Counsel that he anticipated that the City Defendants would file a motion to dismiss the Amended Complaint, and that since the Amended Complaint was filed before any Defendant responded to the Original Complaint, that Plaintiff's "response" to the anticipated motion might be a Second Amended Complaint.

45). On May 30, 2018, the Parties filed a Stipulation of Dismissal as to the Defendants, City and Hospital. This brief is filed in opposition to the Individual Defendants' Motion to Dismiss.

## II.   Statement of Facts

For a complete recitation of the facts, Plaintiff respectfully refers the Court to the Second Amended Complaint (Doc. 34).

## III.   Questions Presented

1.   Are the Defendants entitled to qualified immunity when they wrestled with, and tasered, RANDY for refusing non-lifesaving medication (and acting in self-defense), despite the fact that *almost 30 years ago*, the Supreme Court held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990)?

2.   Are the Defendants entitled to State-Agent and Peace Officer Immunity when they acted without even arguable probable cause and outside the scope of their authority?

## IV.   Argument

**1.   The Defendants used unlawful force to violate clearly established law that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990).**

Defendants, LOTT and MEADOWS, argue that they are entitled to qualified immunity "because they simply did not utilize excessive force and certainly did not violate clearly established law." (Doc. 48 at p. 16). They are not entitled to immunity.

The Defendants' motion to dismiss completely ignores clearly established law. Specifically, *almost 30 years ago,* the U.S. Supreme Court held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990); see also Washington v. Harper, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.") Therefore, the Defendants knew that it was clearly established law that RANDY enjoyed a constitutional right to refuse unwanted medical treatment, and that they were not permitted to use force, *let alone excessive force,* to compel the medical treatment.

There is no evidence of record indicating that RANDY was not competent to refuse the injections of sedating medication. Moreover, there is no evidence of record indicating that a medical emergency existed that required immediate medical intervention. To the contrary, when Defendants, LOTT and MEADOWS, arrived at the hospital, medical personnel were laughing and telling jokes. (Doc. 34 at ¶ 22).

The Defendants argue that "the Graham factors weigh heavily in favor of finding the force used by Officers Lott and Meadows was not excessive as a matter of constitutional law." (Doc. 48 at p. 22). Notably, however, in asserting their argument, the Defendants start their story in the middle, i.e., throwing a hospital gown and tiny vial. The Defendants argue that RANDY'S conduct (in defending

3

himself) constituted harassment, in violation of Ala. Code § 13A-11-8, disorderly conduct, in violation of Ala. Code § 13A-11-7, and/or menacing in violation of Ala. Code § 13A-6-23. (Doc. 48 at p. 22). Again, their argument misses the mark entirely.

The Defendants cannot escape the fact that when they arrived at the hospital and decided to lay hands on RANDY, they had no lawful basis on which to do so. Once they did so, and once they threatened to escalate their unlawful use of force – through the use of a TASER – RANDY was lawfully permitted to use reasonable force to defend himself. Stated another way, the Defendants physically attacked RANDY for his refusal to take medication that he had a constitutional right to refuse. RANDY engaged in self-defense, and Defendants LOTT and MEADOWS attacked him again for doing so.

When Defendants, LOTT and MEADOWS, went hands on, they knew that RANDY had a constitutional right to refuse medication, and that he had not engaged in any criminal conduct. Defendants, LOTT and MEADOWS, knew that their commands to RANDY directing him to consent to the injections were unlawful. They knew that they did not even have arguable probable cause to seize RANDY; yet they used force anyway to seize him. Cf. 1975 Ala. Code § 32-5A-4 (directing that no person "willfully" refuse to comply with a "lawful" order of someone with the authority to regulate traffic); Sly v. State, 387 So.2d 913, 915 (Ala. Cr. App. 1980) (noting that the statute requiring obedience of lawful traffic orders "Was not

intended to, does not, and cannot give police officers unbridled power to arrest for refusal to obey any order they may choose to direct at a citizen").

Compounding their problems further, the Defendants did not stop after a single TASER activation. Instead, it is clear from the video (Amended Complaint Exhibit 1) that they continued to cycle the TASER after RANDY went to the ground. Defendants, LOTT and MEADOWS, however, knew or should have known that as a result of the TASER'S continuous activation, it was physically impossible for RANDY to control his major muscle groups. Therefore, the continued cycling of the TASER cannot be justified solely on the basis that RANDY allegedly failed to comply with Defendants, LOTT and MEADOWS', commands to submit to handcuffing.

In this regard, the immunity issue cannot fairly be decided at this early stage in the litigation because evidence pertaining to how an officer is trained to handle a particular situation – in the form of police department policy and training – is relevant to the inquiry into the objective reasonableness of an officer's use of force in a particular incident. See, e.g., Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir. 2008)). It is alleged that it is believed that discovery will establish that Defendants, LOTT and MEADOWS, violated the Defendant CITY'S policies and procedures. (Doc. 34 at ¶¶ 56, 58, 60, 83 & 84). It is further alleged that it is believed that

discovery will establish that discovery will establish that Defendants, LOTT and MEADOWS, violated the Defendant CITY'S training. Id.

The use of a TASER in "probe mode," to obtain behavior compliance with an unlawful order, is not lawful, and not in accordance with accepted police practices. The Defendants attempt to argue that even if a constitutional injury occurred, the law was either not settled, or settled in their favor. In support, the Defendants cite cases that are simply not applicable. As previously noted, the Defendants specious argument should be rejected because the inquiry starts and ends with the fact that it has been clearly established law for almost 30 years that RANDY enjoyed a constitutional right to refuse the medication in question. Therefore, *any* force used to compel him to submit is unlawful.

The Defendants cite Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008) for the proposition that use of a TASER in a "difficult, tense and uncertain situation" to "subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently towards police is not excessive force." The Defendants, however, fail to acknowledge that in Zivojinovich, the TASER was not used until after the suspect caused the officer and himself to fall down the stairs while resisting a lawful arrest for trespass.

The Defendants cite Alday v. Groover, 601 Fed. App'x 775, 778 (11th Cir. 2015) for the proposition that in 2015, it was not clearly established law that a

6

TASER in drive-stun mode cannot lawfully be used on a handcuffed person who refuses an order to exit a police vehicle. In Alday, however, the TASER was used in *drive-stun mode* against a non-complaint *lawfully arrested* person. The Individual Defendants in the instant matter, however, deployed the TASER into RANDY in *probe mode* for the sole purpose of trying to force him to take medication that he previously rejected.[2]

The Defendants cite Bussey-Morice v. Gomez, 587 Fed. Appx. 621 (11th Cir. 2014), claiming it is "a case that bears uncanny similarity to the present lawsuit." (Doc. 48 at p. 27). The Defendants are mistaken. In Gomez, the suspect had been involuntarily committed, had self-inflicted cuts to his arms that were bleeding badly, indicated that he intended to fight officers, and was attempting to escape the hospital. Id. In the instant matter, RANDY was taken to the hospital because he stopped eating, and refused medication to calm him down when he got scared. RANDY was not under arrest, not lawfully detained, not involuntarily committed, and not a danger to himself or others, when Defendants LOTT and MEADOWS arrived at the hospital.

The Defendants cite Callwood v. Jones, ___ Fed. Appx. ___, 2018 WL 985756 (11th Cir. Feb. 20, 28 2018), in which officers were granted immunity "even

---

[2] The TASER has two modes of use (1) probe, and (2) drive-stun. Discovery will reveal that each type of deployment affects a person very differently.

though they applied a Taser 19 times to a naked man who they encountered walking down a street and who they believed was suffering from excited delirium." (Doc. 48 at p. 30). Unlike RANDY, however, the decedent engaged in criminal conduct (indecent exposure) and violently resisted a lawful arrest with numerous officers. The majority of the TASER deployments in Callwood occurred while the suspect was actively physically fighting officers.

The Defendants cite Mobley v. Palm Beach Cty. Sheriff's Dept., 783 F.3d 1347, 1356 (11th Cir. 2015), in which officers were granted immunity after they allegedly struck and tasered a suspect after he struck an officer with a truck, tried to run over an officer, engaged in a high speed pursuit, and waded into a pond in an apparent further attempt to escape. It is unclear how Mobley is in any way applicable to the instant matter.

The Defendants cite Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1308 (11th Cir. 2009), for the proposition that the use of a Taser on a person suffering from excited delirium "was appropriate 'given the countervailing government interest of safety and compliance,' the fact that the conduct at issue was 'violent, aggressive and prolonged,' and the fact that the deputy warned the subject to stop her behavior to no avail." Unlike RANDY, however, the suspect in Mann was under arrest for felony trespass and criminal mischief, attacked officers with head butts, and attempted to destroy the inside of a police vehicle.  Id.

The Defendants cite Aldaba v. Pickens, 844 F.3d 870 (10th Cir. 2016), claiming that the case is "particularly relevant because the facts of the case are strikingly similar to those here," when in fact, the facts are not. (Doc. 48 at p. 31). In Aldaba, the doctor was concerned about the patient's "low oxygen levels and his lack of IV and oxygen access." The doctor advised officers that "the man could not leave the hospital or he would die." As the patient was walking toward the lobby door, he "pulled gauze and tape from his arms, causing a fairly steady stream of blood out of each arm . . . then raised and shook his clenched fists, yelling, "this is my blood." Ultimately, a TASER was used with negative medical consequences. Id. In contrast, RANDY was not suffering from a medical emergency, a doctor did not advise officers that RANDY would die if they did not act, RANDY was not bleeding profusely or risking a biohazard.

Finally, the Defendants cite Estate of Hill v. Miracle, 853 F.3d 306 (6th Cir. 2017) for the proposition that officers should be entitled to use a TASER during a life-threatening medical emergency to assist medical personal in providing life-saving medical care. Again, since RANDY was not experiencing a life-threatening medical emergency, and since the medical treatment that he refused was not life-saving medical care, Estate of Hill is clearly not applicable.[3]

---

[3] The Defendants also mistakenly argue, "Plaintiff's principal argument appears to be that officers should have treated Nelson differently (or perhaps not dealt with him at all) due to his mental

9

Notably, the Defendants do not mention <u>Oliver v. Fiorino</u>, 586 F.3d 898 (11th Cir. 2009). In <u>Oliver</u>, the Court held that "Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff-including tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized-was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." In reaching its decision, the Court stated the following:

> The justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal. The plaintiff was not accused of or suspected of any crime, and indeed was not threatened with arrest or apprehension at any time prior to (or after) the use of force.  The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle with Officer Burk. He did not act belligerently toward the police officers, and he did not curse or yell at them. In fact, he was largely compliant and cooperative with the officers-moving away from their vehicle when instructed, stopping and talking the first time he was requested to do so (even though not threatened with detainment), stopping when instructed, providing requested identification, and only attempting to disregard the officer and walk away when the officer attempted a "custodial touch" on Oliver's shoulder.
>
> Moreover, the plaintiff did not pose a grave danger to others. . . . Finally, Oliver was not actively resisting arrest nor attempting to evade arrest by flight.
>
> Quite simply, though the initial use of force (a single Taser shock) may have been justified, the repeated tasering of Oliver into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances.

<u>Id.</u>

---

health condition." (Doc. 48 at p. 26). The Defendants, however, appear to confuse the excessive force claim with the ADA claim (which has been voluntarily dismissed). Plaintiff never asserted this argument in support of the excessive force claim. (Doc. 34 at ¶¶ 69-88).

Similarly, even if the initial TASER deployment against RANDY was justified, *which it clearly was not,* the continued activation of the TASER "was grossly disproportionate to any threat posed and unreasonable under the circumstances." RANDY had not engaged in criminal conduct, was not warned that he was under arrest, posed no credible threat to anyone, had not cursed or yelled, and was not resisting arrest or attempting escape. The only time RANDY acted out physically was in response to being touch or threatened with a TASER by the Defendants. Once RANDY was brought to the ground, the continued activation of the TASER was "grossly disproportionate to any threat posed and unreasonable under the circumstances." See Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009).

Finally, it is clearly established law that "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]") (alterations in original) (citing Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998)). Despite having an appreciable opportunity to intervene, Defendant MEADOWS did not explain to Defendant LOTT that he did not have a lawful basis to detain RANDY or to use force against him. Defendant MEADOWS did not instruct Defendant LOTT to put his TASER away, or physically intervene to protect

RANDY from Defendant LOTT. Despite an appreciable opportunity to intervene, Defendant MEADOWS watched while Defendant LOTT shot the TASER into RANDY'S back and repeatedly cycled the TASER. As such, Defendant MEADOWS is not entitled to immunity.

**2. The Defendants are not entitled to State-Agent and Peace Officer Immunity because they acted without even arguable probable cause and outside the scope of their authority.**

The Defendants argue that they are entitled to State-Agent Immunity pursuant to 1975 Ala. Code § 6-5-338. They are not.

The Alabama Supreme Court has developed a burden-shifting framework to govern analysis of the state-agent immunity defense under this statute. See Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006); Ex parte Cranman, 792 So. 2d 392 (Ala. 2000). The party asserting immunity must first establish "that the plaintiff's claims arise from a function that would entitle the State agent to immunity." Ex parte Estate of Reynolds, 946 So. 2d at 452. If the party asserting immunity makes this showing, "the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." Id.

The Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause. See Borders v.

City of Huntsville, 875 So.2d 1168, 1180 (Ala. 2003); 1975 Ala. Code § 6-5-338. Moreover, pursuant to 1975 Ala. Code § 13A-3-27, officers are liable if they use more than a reasonable amount of force in making an arrest, and citizens are liable if they use more than a reasonable amount of force in protecting another person.

V. **Conclusion**

**WHEREFORE,** it is respectfully requested that the Court deny the Defendants' Motion to Dismiss.

**Respectfully Submitted,**

_____          **DATE: May 29, 2018**
**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
Co-counsel for Plaintiff


**MARTIN WEINBERG, ESQUIRE**
WEI-035
P.O. Box 154, Shannon, AL 35142-0154
205.910.3722 | attorneyweinberg@bellsouth.net
Co-counsel for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA (Northeastern Division)

| | |
|---|---|
| **DOROTHY NELSON, individually,** and as the Administrator Ad Litem of the **ESTATE OF RANDY NELSON,** Plaintiff, v. **GREGG LOTT, at al.,** Defendants. | : No.: 5:18-cv-00059-HNJ : : : : : CIVIL ACTION – LAW : JURY TRIAL DEMANDED : : : |

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I electronically filed the foregoing with the Court using the CM/ECF system. In addition, I emailed the foregoing to the following persons:

David J. Canupp, Esquire
Email: DJC@LanierFord.com

Daniel F Beasley, Esquire
Email: dbeasley@lfsp.com


_____                          Date:  May 29, 2018
**DEVON M. JACOB, ESQUIRE**