# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DOROTHY NELSON, who sues** | ) | |
| **individually, and, as** | ) | |
| **Administrator *Ad Litem* of the** | ) | |
| **Estate of Randy Nelson,** | ) | |
| **deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:18-CV-0059-CLS** |
| | ) | |
| **GREGG LOTT, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Randy Nelson died as a result of his encounter with two Athens, Alabama

police officers in the Emergency Room of the Athens-Limestone County Hospital on

February 3, 2016. The Second Amended Complaint filed by Dorothy Nelson, the

mother and Administrator *Ad Litem* of Randy Nelson's estate, alleged eight claims

against four defendants: *i.e.*, (1) a claim under 42 U.S.C. § 1983 against Athens

Police Officers Gregg Lott and Dusty Meadows for the use of excessive force in

violation of the Fourth Amendment to the United States Constitution (Count I); (2)

a separate § 1983 claim against Officer Dusty Meadows for failing to intervene when

Officer Gregg Lott used his Taser to subdue Randy Nelson (Count II); (3) a municipal

liability claim under 42 U.S.C. § 1983 against the City of Athens, Alabama ("the

City"), for failing to properly train Officers Lott and Meadows (Count III); (4) a claim against the City for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*. (Count IV); (5) a claim against the City for violation of the Rehabilitation Act, 29 U.S.C. § 794 (Count V); (6) a claim against the Huntsville Hospital Health System, doing business as the Athens-Limestone County Hospital ("the hospital"), for violation of the ADA (Count VI); (7) a claim against the hospital for violation of the Rehabilitation Act (Count VII); and (8) a claim against all defendants under Alabama Code § 6-5-410 (1975) for the wrongful death of Randy Nelson (Count VIII).[1] All claims against the City and hospital in Counts III through VIII were dismissed with prejudice on June 4, 2018, in accordance with the parties' stipulation.[2] Thus, the only claims that remain pending are those against Officers Gregg Lott and Dusty Meadows in Counts I, II, and VIII.

The case currently is before the court on the motion of defendants Lott and Meadows to dismiss all remaining claims for failure to state claims upon which relief can be granted.[3] Following consideration of the pleadings, briefs of counsel,[4]

---

[1] *See* doc. no. 34 (Second Amended Complaint).

[2] *See* doc. no. 56 (Stipulation for Dismissal), and doc. no. 57 (Order Dismissing Fewer Than All Defendants).

[3] *See* doc. no. 42 (Motion to Dismiss of Officers Gregg Lott and Dusty Meadows); Fed. R. Civ. P. 12(b)(6).

[4] *See* doc. no. 48 (Brief of Defendants Lott and Meadows) (filed under seal); doc. no. 54 (Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss); doc. no. 63 (Reply Brief of Defendants Lott and Meadows) (filed under seal).

evidentiary materials referenced in the complaint,[5] and a transcript of the audio portions of the video recording produced by the body camera attached to the uniform of Officer Dusty Meadows,[6] this court concludes that the motion should be granted.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). That rule must be read together with Rule 8(a), which requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2) (alteration and ellipses supplied). While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The Supreme Court also observed in *Iqbal* that a pleading which offers only

"labels and conclusions" or "a formulaic recitation of the elements of a

---

[5] *See* doc. no. 25 (Thumb Drive containing a copy of the video and audio recordings produced by the body camera attached to the uniform of Athens Police Officer Dusty Meadows) (hereafter, "**Video**"); doc. no. 46 (Evidentiary Submission in Support of Defendants Lott and Meadows Motion to Dismiss); and doc. no. 50 (Feb. 9, 2016 Alabama Department of Forensic Sciences Report of Autopsy) (filed under seal) (hereafter, "**Medical Examiner's Report**").

[6] *See* Attachment to this Memorandum Opinion.

cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.

To survive a motion to dismiss [founded upon Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule

Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis and first and third alterations supplied, all other alterations in original). In addition, Federal Rule of Civil Procedure 12(d) states that:

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). Thus, courts normally "do not consider anything beyond the face of the complaint *and documents attached thereto* when analyzing a motion to dismiss." *Financial Security Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (emphasis supplied) (citing *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997)).

Here, however, the parties' briefs reference two evidentiary items that are not attached to the complaint: *i.e.,* doc. no. 25 (the video recording of the incident produced by the "bodycam" attached to Officer Meadows's uniform); and, doc. no. 50 (the February 9, 2016 Alabama Department of Forensic Sciences Report of Autopsy

5

(hereafter, "**Medical Examiner's Report**")). Even though neither of those evidentiary items are *attached to* plaintiff's Second Amended Complaint, both are clearly referred to therein.[7] And, at least with regard to the bodycam video, the failure to actually attach a copy to the complaint appears to have been merely a clerical omission. Accordingly, the court will rely upon both the bodycam video and the autopsy report, in addition to the allegations of plaintiff's Second Amended Complaint, when determining the relevant facts.

## II. ALLEGATIONS OF THE SECOND AMENDED COMPLAINT AND EVIDENTIARY MATERIALS REFERENCED THEREIN

Dorothy Nelson ("plaintiff") is the mother of Randy Nelson ("Nelson") and Administrator *Ad Litem* of his estate.[8] On the date of the events leading to this action, Nelson was a large,[9] forty-nine-year-old man who "was known to suffer from chronic mental illness, having been previously diagnosed with schizophrenia and bipolar

---

[7] *See* doc. no. 34 (Second Amended Complaint), at ¶ 26 ("The unlawful force used by Defendants, LOTT and MEADOWS, to unlawfully detain RANDY for the purpose of forcing him to consent to the injections, and the reasonable force used by RANDY in self-defense, was captured on Defendant MEADOWS' body camera. See Video, Exhibit 1.") (capitalization in original); *id.* at ¶ 31 ("It is clear from the video . . . ."); *id.* at ¶ 32 ("Likewise, it is clear from the video . . . ."); and *id.* at ¶¶ 50-51 (summarizing and even quoting from the Medical Examiner's Report).

[8] Doc. no. 34 (Second Amended Complaint), at ¶ 4.

[9] The Medical Examiner's Report lists Nelson's height as 70 inches (5' 10"), and his weight as 262 pounds. Doc. no. 50, at ECF 2. **Note:** "**ECF**" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). *See The Bluebook: A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). When this court cites to pagination generated by the ECF header electronically imprinted on a scanned copy of an original document filed in this case, it will, as here, precede the page number(s) with the letters "ECF."

disorder, and having been approved to receive social security disability [benefits as a result of his mental conditions]."[10]

The Second Amended Complaint alleges that plaintiff drove her son to the Athens-Limestone Hospital ("hospital") on February 3, 2016, for the purpose of receiving treatment for "anorexic with extremely poor oral intake."[11] The Medical Examiner recorded that Nelson's "behavioral problems" had begun four days earlier.[12]

> This 49-year-old male was taken to the Athens-Limestone Emergency Department (ED) on February 3, 2016, at 0850 hours with behavioral problems. His mother denied the presence of a fever, cough, or other complaint. The onset of his behavioral problems was 4 days prior to his presentation at the ED. According to medical records, the patient was unable to care for himself, control himself, *and had unclear thinking with associated agitation.* The decedent had been nonverbal for 4 days and reportedly not taking his medication for several days. He had a history of bipolar disorder and schizophrenia. He had gone to Mental Health Center of North Alabama earlier in the day and was referred to the ED [*i.e.,* Emergency Department] for an evaluation for psychosis. *He presented as being uncooperative*, in no distress *and nonresponsive* when checking his orientation and memory. *His affect was noted to be angry, anxious, and violent.*

Doc. no. 50 (Medical Examiner's Report), at ECF 3 (alteration and emphasis supplied).

One hour and forty-one minutes after Nelson's arrival (*i.e.,* "at 1031 hours"),

---

[10] Doc. no. 34 (Second Amended Complaint), at ¶ 11 (alteration supplied).

[11] *Id.* at ¶ 10. There is no explanation of the origin of the assessment "anorexic with extremely poor intake."

[12] Doc. no. 50 (Medical Examiner's Report), at ECF 3.

he became "more agitated" and "more aggressive to the nurses" when intramuscular injections of two sedatives, Geodon and Ativan, were ordered.[13] Rather than calling for the help of mental health professionals, hospital personnel sought police assistance. Officers Lott and Meadows responded. The Medical Examiner's Report summarized ensuing events as follows:

> The patient became more agitated and became violent, running into the wall at least twice. He had been warned by officers to back down or he would be tazed. He was aggressive toward an officer and was subsequently tazed. Even after this, he continued fighting and kicking at that point. An officer was finally able to get control of his arm, and the patient was given the intramuscualar drugs previously ordered in his thigh. He was then held down and arms secured; he was turned into the prone position and handcuffed, still fighting. Approximately 3-4 minutes into holding him in the prone position, he was rolled over and noted to have agonal respirations. He was placed on a monitor and found to be asystolic. Resuscitative efforts enabled the patient to regain a pulse and he was hypotensive. Dopamine, Levophed, and a fluid bolus of 2 liters were given. An electrocardiogram revealed atrial fibrillation with rapid ventricular response which was then converted to sinus rhythm. Patient was on a ventilator at this time and given some magnesium for the possibility of prolonged QT intervals.

> \* \* \* \*

> The patient was admitted to the Intensive Care Unit (ICU) on February 3, 2016, due to his cardiorespiratory arrest and developed overnight severe respiratory distress while on mechanical ventilation on propofol. Acute kidney injury showed significant worsening in the creatinine and a decrease in urine output. Liver damage was noted with an elevation in transaminases likely secondary to the cardiorespiratory

---

[13] *Id.*, 2d ¶, at ECF 3.

arrest at admission. The patient was placed on pressors[14] and a broad spectrum antibiotic therapy because of the hypotension that occurred during admission. Pressors were later discontinued as patient developed persistent hypertension. He also developed fevers and rhabdomyolysis that most likely caused worsening of the renal function even with aggressive intravenous fluid. Due to hemodynamic instability and evidence of multiorgan system failure, transfer to Huntsville Hospital was done at approximately 0630 hours on February 4, 2016.

While at Huntsville Hospital, the patient continued being critically ill, not waking to verbal or painful stimuli, and continuing to be on a mechanical ventilator. He had no voluntary movements at all. The pupils were nonreactive; the corneal, cough and gag reflexes were absent. The extremities were flaccid and no reflexes were obtained. Clinically, all brainstem reflexes were absent and electrical activity and MRI findings were suggestive of brain death. He subsequently died on February 8, 2016 [i.e., five days after Nelson's initial presentment to the Emergency Department of Athens-Limestone Hospital].

Doc. no. 50 (Medical Examiner's Report), at ECF 3-4 (alteration and footnote supplied).

The encounter between Nelson and the officers also was captured on Officer Meadows's bodycam video.[15] As the officers entered the treatment room to which Nelson had been assigned, four hospital employees were standing in the entryway, Nelson was sitting on the edge of a bed, and plaintiff was seated in a chair, facing her

---

[14] "Pressors" are drugs that tend to increase blood pressure. *See, e.g., Dorland's Illustrated Medical Dictionary* 1504 (30th ed. (2003)).

[15] *See* doc. no. 25 (Video). **Note:** A transcript of the audio statements recorded on the Video prepared by this court's Official Court Reporter is appended to this opinion.

son.[16] An unidentified male hospital employee told the officers: "We're going to give him some Geodon and Ativan to calm him down. . . . It's more than we can handle to hold him. And I just need a strong mind — I mean, a strong back and a weak mind."[17] Neither police officer asked whether the sedatives were medically necessary to treat a life-threatening medical condition.[18] The same male hospital employee said: "And this is going to go in the top of his leg. We've got two shots to give him."[19] As Nelson continued to sit on the edge of the bed, plaintiff rose from her chair and stood in the right-rear corner of the room.[20] Officer Meadows entered the room and spoke to Nelson, saying: "What's going on, man? You okay? He's going to give you some medicine to make you feel better, all right?"[21]

The male hispital employee asked Nelson to "[c]limb back up here in the bed," and Officer Meadows instructed him to: "Just lay down. They're going to take good care of you, okay?"[22] Nelson initially began to lie face-down on the bed, but then he

---

[16] Doc. no. 34 (Second Amended Complaint), at ¶ 21; doc. no. 25 (Video), at 1:39.

[17] Doc. no. 25 (Video), at 1:40-1:56; Transcript (attached to this opinion), at 1:1-6; doc. no. 34 (Second Amended Complaint), at ¶ 22.

[18] Doc. no. 34 (Second Amended Complaint), at ¶ 23.

[19] Doc. no. 25 (Video), at 2:01-2:04; Transcript (attached to this opinion), at 1:8-9.

[20] Doc. no. 25 (Video), at 2:04-2:06.

[21] Id.; Transcript (attached to this opinion), at 1:11-13.

[22] Doc. no. 25 (Video), at 2:11-2:15; Transcript (attached to this opinion), at 14-17 (alteration supplied).

suddenly sat back up, on the edge of the bed.[23]  For a few seconds, he alternated between lying down and sitting up.  Whenever Nelson sat up, however, he swung his arms in a movement similar to a boxing punch, but with less velocity.  He did not appear to attempt to strike any particular person.[24]  Officer Meadows can be heard describing Nelson's movements as being like "the Matrix."[25]  (His reference apparently was to the 1999 movie entitled *The Matrix*, which is "known for popularizing a visual effect known as 'bullet time,' in which the heightened perception of certain characters is represented by allowing the action within a shot to progress in slow-motion while the camera's viewpoint appears to move through the scene at normal speed."[26])

Officer Meadows twice directed Nelson to "chill out."[27]  Both Officers and the male hospital employee attempted to grab Nelson, but he resisted their efforts to restrain him by swinging his arms and legs in an aggressive manner.  After approximately eight seconds, Officer Meadows said "Let him go," and the three men released their grasp.  Nelson stood up and thrust his upper body in the direction of the Officers, lunging toward them, and swung the bottom of his hospital gown in their

---

[23] Doc. no. 25 (Video), at 2:15-2:17.

[24] *Id.* at 2:18-2:23.

[25] *Id.* at 2:21; Transcript (attached to this opinion), at 1:20-21 (alteration supplied).

[26] https://en.wikipedia.org/wiki/The_Matrix, last visited July 15, 2018.

[27] Doc. no. 25 (Video), at 2:23-2:28; Transcript (attached to this opinion), at 1:22-24.

direction. Officer Meadows twice instructed Nelson to "relax."[28] Two female hospital employees who had been standing near the entry door exited the room.[29] Nelson continued to advance toward the door, lunging and waving his arms at the Officers in an aggressive manner, and they backed out of the room, leaving only Nelson, his mother, and the male hospital employee in the room.[30] Nelson continued to stand in the doorway and lunge toward the Officers in the hallway, making grunting noises, for approximately seven more seconds.[31] Both Officers said "stop," and his mother instructed him to "come back over here."[32] Plaintiff and the male hospital employee also exited the room at that point, and Nelson kicked at the male hospital employee on his way out the door.[33] Nelson continued to stand in the doorway, with everyone else in the hallway just outside the door, for approximately ten more seconds.[34] Plaintiff commented that her son had "never acted like that before."[35] Officer Lott then told her: "Mom, I'm going to have to tase him and I don't want to, but I'm going to have

---

[28] Doc. no. 25 (Video), at 2:28-40; Transcript (attached to this opinion), at 2:1-2.

[29] Doc. no. 25 (Video), at 2:40-2:44.

[30] *Id.* at 2:45-2:53.

[31] *Id.* at 2:53-3:00.

[32] *Id.* at 2:53-3:00; Transcript (attached to this opinion), at 2:5-9.

[33] Doc. no. 25 (Video), at 2:58-3:00. The video does not clearly show whether Nelson's foot actually made contact with any part of the male nurse's body.

[34] *Id.* at 3:00-3:10.

[35] *Id.* at 3:05-3:06; Transcript (attached to this opinion), at 2:11.

to, okay? . . . There's no other way of doing this." Plaintiff responded, "Okay."[36]

As Nelson turned and walked toward the rear of the treatment area, Officer Lott approached the door from the hallway. Nelson pushed the wheeled hospital bed toward the door, then he removed his hospital gown and threw it toward the door.[37] Officer Meadows instructed him to: "Chill out. Just relax. Relax, man. Just chill out, okay? We're trying to help you, okay? We're just trying to help you, buddy. We ain't trying to hurt you."[38] Officer Lott then entered the room with his Taser gun drawn, and Nelson picked up a vial of medicine from the counter in the back of the room and threw it at Lott. The vial appeared to hit Lott in the face.[39] Nelson advanced toward Officer Lott, leaning over the hospital bed, which was between the two men. Officer Lott backed up toward the door and instructed Nelson to "stop" and "turn around."[40] Officer Meadows continued to tell Nelson to "relax."[41] When Nelson turned around, facing the back wall of the room, Officer Lott fired his Taser. The prongs lodged in Nelson's back,[42] and he fell to the floor, face down, but then almost immediately

---

[36] Doc. no. 25 (Video), at 3:10-3:15; Transcript (attached to this opinion), at 2:15-2:19.

[37] Doc. no. 25 (Video), at 3:16-3:23.

[38] *Id.* at 3:18-32; Transcript (attached to this opinion), at 2:20-23.

[39] Doc. no. 25 (Video), at 3:33-3:40.

[40] *Id.* at 3:41-3:45; Transcript (attached to this opinion), at 3:1-2.

[41] Doc. no. 25 (Video), at 3:49; Transcript (attached to this opinion), at 3:3.

[42] Doc. no. 25 (Video), at 3:51-3:52.

13

turned back over, facing up.[43] Officers Lott and Meadows then advanced on Nelson, and one of them instructed Nelson to put his hands behind his back. Nelson did not comply, but instead waved his arms and raised his leg in the air.[44] Officer Meadows repeatedly told Nelson to turn over, but he did not do so. Instead, he continued to wave his arms, and grabbed the cord on a piece of wheeled medical equipment resembling a heart monitor and tried to fling the device at the officers.[45] Officer Lott then activated his Taser a second time, saying: "I'm going to have to keep [inaudible]."[46]

The video does not clearly depict how many times Officer Lott cycled the Taser after Nelson fell to the floor, but the Second Amended Complaint — which must be accepted as true, except to the extent that it is directly contradicted by images recorded on the video, *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") — alleges that the cycling was "repeated."[47] Officer Meadows eventually was able to release Nelson's grasp on

---

[43] *Id.* at 3:53-3:54.

[44] *Id.* at 3:55-3:58; Transcript (attached to this opinion), at 3:6.

[45] Doc. no. 25 (Video), at 3:58-4:10; Transcript (attached to this opinion), at 3:7-3:8.

[46] Doc. no. 25 (Video), at 4:11-4:12; Transcript (attached to this opinion), at 3:9-3:10.

[47] Doc. no. 34 (Second Amended Complaint), at ¶¶ 43-47.

the equipment cords, and move the equipment out of the way.[48]

The officers, with the assistance of the male hospital employee, held Nelson down and attempted for approximately forty-nine seconds to place handcuffs on him.[49] During the scuffle, a female hospital employee can he heard saying: "All right. I got his medicine in."[50] The officers and male hospital employee then were able to roll Nelson over, onto his stomach, and cuff his hands behind his back. Nelson continued to resist until he was cuffed.[51] Thereafter, the hospital employees were able to hold Nelson down without the involvement of defendants, and they pulled the Taser probes out of Nelson's back approximately thirty-five seconds after he was handcuffed.[52]

For approximately one minute after the Taser probes were removed from Nelson's back, hospital employees (including two men and the female staffers who had returned to the room after Nelson had been subdued) discussed how to move him for further treatment. During that minute, Nelson remained on the floor, face down, with his hands cuffed behind his back, and only occasionally arched his back or

---

[48] Doc. no. 25 (Video), at 4:15-4:17; Transcript (attached to this opinion), at 3:11 ("Get this out of the way.").

[49] Doc. no. 25 (Video), at 4:28-5:07.

[50] *Id.* at 5:02-5:03; Transcript (attached to this opinion), at 3:21-22.

[51] Doc. no. 25 (Video), at 5:05-5:36. Nelson was a large man: *see supra* note 9. Consequently, Officers Lott and Meadows linked two sets of handcuffs together to double the length, in an obvious effort to make Nelson more comfortable.

[52] *Id.* at 5:37-6:15.

attempted to lift his legs.[53]   After that, he lay still for approximately a minute and twenty-five seconds until another hospital employee brought a stretcher-board into the room, for the purpose of rolling Nelson onto the board and lifting him from the floor.[54] Approximately three minutes and fourteen seconds after Nelson had been handcuffed, Officer Meadows asked whether Nelson was breathing.[55]   Meadows asked again sixteen seconds later, after one of the hospital employees who had assisted in rolling Nelson onto the stretcher-board commented that he looked "kind of blue."[56]   A few seconds later, Officer Meadows noted that Nelson was "taking some short breaths."[57] The remainder of the video depicts Nelson receiving emergency medical treatment from hospital personnel.

Plaintiff's Second Amended Complaint states that Nelson had suffered respiratory and cardiac arrest; and, despite the fact that attempts at resuscitation by hospital personnel initially were successful, he died five days later, on February 8, 2016.[58]   The Medical Examiner's report states that the primary cause of death was

---

[53] *Id.* at 6:15-7:15.

[54] *Id.* at 7:16-8:41.

[55] *Id.* at 8:50.

[56] *Id.* at 9:06-9:08; Transcript (attached to this opinion), at 6:8-6:9.

[57] Doc. no. 25 (Video), at 9:15-9:16; Transcript (attached to this opinion), at 6:11-6:12.

[58] Doc. no. 34 (Second Amended Complaint), at ¶¶ 46-49.

"Excited Delirium Associated With Mental Illness and Therapeutic Medications."[59]

The report explained:

> The circumstances surrounding the death of this individual correspond to events that typically occur in instances of excited delirium. The excited delirium syndrome involves the sudden death of a person during or following an episode of excited delirium, in which the autopsy fails to provide evidence for significant trauma or natural disease to have caused death. In virtually all cases, excited delirium is halted by a struggle with the police or medical personnel, and the use of physical restraints. Usually, within minutes following the struggle, the individual is found to be in cardiorespiratory arrest. Attempts at resuscitation are usually unsuccessful. If resuscitation is accomplished, the individual has usually undergone irreversible hypoxic encephalopathy and death occurs within days following the event.

> Bipolar disorder and schizophrenia are considered risk factors for developing excited delirium. Death in excited delirium often results from a fatal cardiac arrhythmia due to a hyperadrenergic state caused by the release of catecholamines and a rapid and steep drop in blood potassium concentrations following cessation of the struggle in association with increasing levels of catecholamines. The hyperadrenergic state is almost invariably aggravated by illegal stimulants which cause increased levels of catecholamines, medications that either have the same actions as the stimulants causing the increased concentration of catecholamines and/or cause a prolongation of the QT interval. Also aggravating the circumstances of a hyperadrenergic state is the presence of natural disease of a degree insufficient in itself to cause death, but when in combination with a hyperadrenergic state can do so.

> Based on the clinical circumstances surrounding the death of this individual, the best conclusion is that his death was a result of an episode

---

[59] Doc. no. 50 (Medical Examiner's Report), at ECF 3. The Medical Examiner listed "Hypertensive Cardiovascular Disease, Obesity and Physical Exertion" as secondary causes of Nelson's death. *Id.*

of excited delirium associated with mental illness and therapeutic medications, and was complicated by hypertensive cardiovascular disease, obesity, asthma and the physical struggle. Therefore, the cause and manner of death in this case are best classified as above.

Doc. no. 50 (Medical Examiner's Report), at ECF 4-5.[60]

## III. DISCUSSION

**A.    Count I**: *Plaintiff's excessive force claim*

Count I of plaintiff's Second Amended Complaint alleges under 42 U.S.C. § 1983 that Officers Lott and Meadows employed excessive force in violation of the Fourth Amendment when attempting to subdue Nelson at the request of hospital

---

[60] The Eleventh Circuit discussed "excited delirium" in *Mann v. Taser International, Inc.*, 588 F.3d 1291 (11th Cir. 2009), saying that:

> Although [the term is] not a validated diagnostic entity in either the International Classification of Diseases or the Diagnostic and Statistical Manual of Mental Disorders, "excited delirium" is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. Carolyn B. Robinowitz, MD, Report of the Counsel on Science and Public Health 453 (American Medical Association, annual meeting 2009).

*Id.* at 1299 n.4 (alteration supplied). *See also, e.g., Hoyt v. Cooks*, 672 F.3d 972, 979 n.7 (11th Cir. 2012) (stating that the symptoms of "excited delirium" include "imperviousness to pain, great strength, bizarre behavior, aggression, and hallucinations").

employees.[61] "Freedom from unreasonable searches and seizures under the Fourth Amendment 'encompasses the right to be free from excessive force during the course of a criminal apprehension.'" *Mobley v. Palm Beach County Sheriff's Department*, 783 F.3d 1347, 1353 (11th Cir. 2015) (*per curiam*) (quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.").[62]

Officers Lott and Meadows contend that they are entitled to "qualified immunity" from suit on that claim. The qualified-immunity defense protects government officials engaged in discretionary functions and sued in their individual capacities *unless* they violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Keating v. City of Miami*, 598

---

[61] The pertinent portion of 42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . . [Ellipsis supplied.]

[62] The "incorporation" of the Fourth Amendment into the Due Process Clause of the Fourteenth Amendment and, thereby, its application to the various states, was finalized by the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961). *See also, e.g., Ker v. California*, 374 U.S. 23 (1963); and *Wolf v. Colorado*, 338 U.S. 25 (1949).

F.3d 753, 762 (11th Cir. 2010); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001). Qualified immunity attempts to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The defense allows government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638 (1987), *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003), thereby protecting from suit "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

Thus, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including discovery.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Lambert v. Fulton County*, 253 F.3d 588, 596 (11th Cir. 2001)). Nevertheless, the defense does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the

action with the malicious intention to cause a deprivation of constitutional rights or other injury. . . ." *Wood v. Strickland*, 420 U.S. 308, 322 (1975) (alteration in original); *see also Harlow*, 457 U.S. at 815 (same); *Holmes*, 321 F.3d at 1077 (same).

The only prerequisite for invoking the defense is for the public official to show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013); *Lee*, 284 F.3d at 1194; *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). Plaintiff does not dispute the assertion of Officers Lott and Meadows that they "were engaged in the performance of their official duties as police officers for the City of Athens."[63] Instead, plaintiff argues only that "[n]either the Fourth Amendment nor Alabama state law permits officers to use excessive force while performing discretionary functions."[64]

---

[63] Doc. no. 48 (Brief of Defendants Lott and Meadows), at 16; *see also id.* at 15-16, where defendants argue in full that:

> "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that *fell within the employee's job responsibilities*." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (emphasis supplied). Here, the matters at issue in this case arise out of alleged acts undertaken by Officers Lott and Meadows while they were engaged in the performance of their official duties as police officers for the City of Athens. Since the officers have met their initial burden of showing they were engaged in a discretionary function, the burden shifts to plaintiff to show that qualified immunity does not apply. See Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010); McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

[64] Doc. no. 34 (Second Amended Complaint), ¶ 73 (alteration supplied). *See also* doc. no. 54 (Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss), at 12-13 (arguing that

Accordingly, the burden shifts to plaintiff to show that qualified immunity is not appropriate by establishing: (1) that the defendants' conduct, viewed in the light most favorable to the plaintiff, violated a constitutional right; and (2) the constitutional right was "clearly established . . . in light of the specific context of the case, [and] not as a broad general proposition," on the date that the allegedly wrongful acts occurred. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (ellipsis and alteration supplied).[65] A district court is granted the flexibility to decide those issues in either order, but the plaintiff must satisfy both requirements in order to negate the defendants' qualified-immunity defense. *See, e.g., Pearson*, 555 U.S. at 236; *Maddox v. Stephens*, 727 F.3d 1109, 1120-21 (11th Cir. 2013); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012); *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).

---

defendants are not entitled to "State-Agent Immunity pursuant to 1975 Ala. Code § 6-5-338" because they acted without arguable probable cause).

[65] *See also, e.g., White v. Pauly*, 580 U.S. —, 137 S. Ct. 548, 551 (2017) (*per curiam*) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (alterations and internal quotation marks omitted); *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'") (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (same); *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1149–1150 (11th Cir. 1994) (*en banc*) (observing that qualified immunity protects all governmental agents, except those whose actions were "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing").

## 1.    The first element of the qualified immunity test

The first inquiry in reviewing the claim alleged in Count I of plaintiff's complaint is to determine whether she has "sufficiently alleged a constitutional or statutory violation." *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009). "Without a . . . violation, there can be no violation of a clearly established right." *Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir. 2003).

Plaintiff alleges that the Fourth Amendment "does not provide police officers with a privilege to use force to compel a patient, in a hospital, to consent to the administration of sedating medication in non-emergency situations."[66] In assessing such a claim, courts must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). A court must evaluate several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The question of whether the use of force was reasonable must ultimately be determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see also, e.g.*, *Mann*, 588 F.3d at

---

[66] Doc. no. 34 (Second Amendment Complaint), Count I, ¶ 72, at 15.

1306 (same).

Those standards do not nicely fit the facts of this case, however. For example, Nelson had committed no crime before defendants were summoned to the hospital. Indeed, Officers Lott and Meadows were only told upon their arrival that Nelson was more than hospital staff could "handle" or "hold" while attempting to inject sedatives, and they needed "a strong back and a weak mind" to assist in restraining him.[67] Even so, defendants persuasively contend that Nelson reasonably could have been charged with three state offenses during the interval between their arrival in the emergency room and Officer Lott's deployment of his Taser: *i.e.*, (1) the crime of harassment by throwing a vial of medicine at (and striking) Officer Lott;[68] (2) the crime of disorderly conduct for fighting with the officers and medical personnel who were attempting to subdue him;[69] and (3) the crime of menacing when several people (including plaintiff) left the room in fear during the incident.[70]

---

[67] *See supra* note 17 and accompanying text.

[68] *See* Ala. Code § 13A-11-8(a)(1)(a) ("A person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she either: a. Strikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact."); *Watson v. State*, 497 So. 2d 207, 208 (Ala. Crim. App. 1986) (holding that "the defendant's conduct in striking Officer Grimes does constitute the misdemeanor of harassment").

[69] *See* Ala. Code § 13A-11-7(a)(1) ("A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he or she . . . Engages in fighting or in violent tumultuous or threatening behavior.").

[70] *See* Ala. Code § 13A-6-23 ("A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury."). Plaintiff denied that there was probable cause to arrest Nelson for any of the state

24

Moreover, Nelson was not armed. And, even though he thrust his arms and legs at defendants and hospital employees in a pugilistic manner, his aggressive movements were not rapid, but in slow motion.[71] Nevertheless, given Nelson's large size and the physical strength revealed in the video recording of his prolonged and aggressive resistence to rational behavior, it clear that he was a danger to hospital staff and the officers.

Ultimately, however, it is difficult to apply tests developed for determining the reasonableness of police conduct when effecting the arrest of a criminal to the entirely different context of controlling of an agitated, mentally-ill individual who is aggressively resisting medical therapy. The difficulty is apparent in the Eleventh Circuit's disposition of the issue in *Bussey-Morice v. Gomez*, 587 F. App'x 621 (11th Cir. 2014). That case is not on "all fours" with the present one, but the facts are closely aligned. Preston Bussey, the plaintiff's decedent in *Gomez*, was not suspected of any crime when he entered a Florida hospital during the early morning hours of December 2, 2009, but medical staff, hospital security guards, and local police officers

_____

offenses identified in text, but she did not explain why. *See* doc. no. 54 (plaintiff's brief), at 3-4 ("The Defendants argue that RANDY's conduct (in defending himself) constituted harassment, in violation of Ala. Code § 13A-11-8, disorderly conduct, in violation of Ala. Code § 13A-11-7, and/or menacing in violation of Ala. Code § 13A-6-23 . . . . Again, their argument misses the mark entirely.") (capitalization in original).

[71] *See supra* notes 24-26 and accompanying text (discussing Officer Meadows's observation that the manner in which Nelson thrust his arms and legs was like "the Matrix").

uniformly described him as belligerent, agitated, psychotic, and hallucinating. His actions posed an obvious threat of harm to himself and others. Like Nelson here, Bussey died after being tased by police. When evaluating the defendants' qualified immunity defense, the Eleventh Circuit chose to side-step the question of whether the police officers' use of Tasers to subdue Bussey violated the Fourth Amendment. *See id.* at 627 ("Because we find that the alleged illegality of Gomez and Hewatt's behavior was not clearly established at the time of their actions, we need not decide whether a constitutional violation took place.") (citing *Maddox,* 727 F.3d at 1120-21, for the proposition that a plaintiff must satisfy both requirements of the qualified immunity test in order to negate the defense). Other Eleventh Circuit opinions have followed a similar course when evaluating police officers' use of Tasers to subdue mentally ill individuals who were not suspected of a crime, but whose behavior threatened their own safety, or the safety of others around them. *See, e.g., Callwood v. Jones,* F. App'x 552, 559 (11th Cir. 2018) (beginning with the question of whether police use of a Taser to subdue a mentally-ill man walking naked along a highway violated clearly established law, because the man had "acted erratically, ignored commands to stop, and tried to enter homes"); *Hoyt v. Cooks,* 672 F.3d 972, 977 (11th Cir. 2012) ("Because we find that the illegality of Cooks's and Harkleroad's behavior was not clearly established at the time, we need not decide whether there was a

constitutional violation.") (citing *Pearson*, 555 U.S. at 236).

In summary, even though the use of a Taser under the circumstances revealed by Officer Meadows's bodycam recording appears appropriate to protect the safety of hospital staff and defendants, as well as to compel Nelson's compliance with the administration of sedatives, it ultimately is not necessary to determine whether a constitutional violation occurred because the illegality of such conduct was not clearly established on the date of the event leading to this suit.

## 2. The second element of the qualified immunity test

The second element of the qualified immunity test requires a determination of whether the constitutional violation was "clearly established" on the date of the event leading to suit. The focus at this step of the analysis is on the question of whether the officer had "fair notice" that his conduct was unlawful. *See, e.g., Hope v. Pelzer,* 536 U.S. 730, 741 (2002); *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015); *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003). Consequently, the reasonableness of the officer's conduct "is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) *(per curiam)*. That standard does not require "[e]xact factual identity with a previously decided case[,] . . . but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) *(en*

*banc*) (alterations supplied).

Even though Supreme Court precedent does not require a case directly on point in order to say that the unlawfulness of particular conduct was "clearly established" on the date of the injury in question, "'existing precedent must have placed the statutory or constitutional question beyond debate.' In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 580 U.S. —, 137 S. Ct. 548, 551 (2017) (*per curiam*) (quoting *Mullenix v. Luna*, 577 U.S. —, 136 S. Ct. 305, 308 (2015) (*per curiam*)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (alteration in original) (quoting *Saucier*, 533 U.S. at 205); *see also, e.g., Kisela v. Hughes*, — U.S. —, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (same).

> Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful.

*Kissela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 309, 312). *See also*

28

*Ashcroft v. al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

When combing through pre-existing caselaw, federal district courts located in Alabama are instructed to look at binding decisions of the United States Supreme Court, the Eleventh Circuit, and the Alabama Supreme Court. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016); *Hoyt*, 672 F.3d at 977 (citing *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007)).

Plaintiff argues that the Supreme Court's decision in *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261 (1990), and the Eleventh Circuit's opinion in *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), should have placed defendants on fair notice that their conduct violated her son's Fourth Amendment right to be free from the use of excessive force. As the discussion in the following sections will demonstrate, however, neither precedent staked out a bright line.

**a.**    *Cruzan v. Director, Missouri Department of Health*

The Supreme Court's 1990 decision in the *Cruzan* case addressed the question of whether a hospital could be forced to withdraw life-sustaining treatment from a patient who languished in a persistent vegetative state with virtually no chance of regaining her mental faculties, when that patient had previously expressed a desire not

to be kept alive under such circumstances. *See* 497 U.S. at 266-69.[72] The detailed

facts and ultimate disposition of the case are not relevant here; instead, the relevant

consideration is the Supreme Court's holding that "*a competent person* has a

constitutionally protected liberty interest in refusing unwanted medical treatment."

*Id.* at 278 (emphasis supplied).

Plaintiff in the present case asserts on the basis of that holding that, because her

son had a clearly-established constitutional right to refuse medical treatment, Officers

Lott and Meadows were not justified in using *any* level of force to restrain him while

medical personnel administered the intramuscular injections he had refused.

Setting to one side the question of whether Nelson was *competent* to refuse

medical treatment on the date of the events leading to this case,[73] plaintiff's argument

still fails because the *Cruzan* decision does not clearly establish that the behavior of

Officers Lott and Meadows was unlawful. A Supreme Court decision declaring a

---

[72] A Missouri State Court found that Nancy Cruzan, at age 25, had expressed in a "'somewhat serious conversation with a housemate friend that if sick or injured she would not wish to continue her life unless she could live at least halfway normally[, and that fact] suggests that given her present condition she would not wish to continue on with her nutrition and hydration.'" *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 267 (1990) (alteration supplied, citation omitted).

[73] The Medical Examiner's Report states that plaintiff's decedent had experienced "behavioral problems" for four days before his mother brought him to the hospital. Doc. no. 50 (Medical Examiner's Report), at ECF 3. He was unable to care for or control himself, had unclear thinking with associated agitation, and was nonverbal. He had not been taking the medications prescribed for his bipolar disorder and schizophrenia. *Id.* Those facts, coupled with Nelson's behavior in the hospital, call into serious question his competency, but it is not necessary to make that determination for purposes of ruling upon the defendants' motion to dismiss.

person's due process right to refuse unwanted medical treatment cannot be said to provide fair warning of a subsequent excessive force violation, because the constitutional inquiries share little common ground. The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. —, 135 S. Ct. 1765, 1775-76 (2015) (in turn quoting *Ashcroft v. al-Kidd*, 563 U.S. at 742) (quotation marks omitted, ellipsis supplied); *see also Brosseau*, 543 U.S. at 198-99.

It would be questionable even to say that a case generally declaring an individual's Fourth Amendment right to not be subjected to excessive force could control with obvious clarity any subsequent case involving the exercise of force under a particular set of circumstances. That is because the legitimacy of an officer's use of force in any given situation is a complex, fact-oriented inquiry requiring a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." *Oliver*, 586 F.3d at 905 (quoting *Graham*, 490 U.S. at 396).

It is not surprising, then, that this court's research has revealed no case in which the *Cruzan* decision has been applied in the context of a Fourth Amendment excessive

force claim. There are only cases, as defendants point out, suggesting that the *Cruzan* holding should *not be* applied in that context. For example, the Seventh Circuit's opinion in *Estate of Allen v. City of Rockford*, 349 F.3d 1015 (7th Cir. 2003), held that *Cruzan* did not grant a person "a constitutional right to state protection from unwanted medical treatment after a physician has determined that treatment is required and found her incompetent to make decisions about her medical treatment." *Id.* at 1021. According to the Seventh Circuit, "language suggesting that state actors who are not physicians must prevent unwanted medical treatment notwithstanding a doctor's determination that the person refusing treatment is incompetent" was "[c]onspicuously absent from the *Cruzan* opinion." *Id.* (alteration supplied).

In *Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004), Sullivan was arrested for disorderly conduct and produced an alarmingly high breathalyzer test result. The jail refused to admit Sullivan without medical clearance, so he was transported to a hospital. An emergency room physician ordered a urine sample, but Sullivan could not produce one voluntarily, so the physician ordered that the sample be obtained through catheterization. Sullivan did not consent to the catheterization, and he had to be physically restrained by two officers during the procedure. He later sued the officers, claiming that they violated his rights to due process and to be free from unreasonable searches and seizures. *Id.* at 373-75. The Seventh Circuit framed the

question before it as whether "the officers' acquiescence in the nurse's request to help

her restrain Sullivan during the brief catheterization procedure violate[d Sullivan's]

rights under either the Fourth or Fourteenth Amendments?" *Id.* at 376 (alteration

supplied). The Court answered that question in the negative. Addressing Sullivan's

Fourth Amendment search and seizure claim, the Seventh Circuit opinion stated:

> *There is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee.* Under the circumstances here, which we have already recounted, the officers' actions were entirely reasonable. As the district court correctly noted in its discussion of the qualified immunity defense, a holding to the contrary would place law enforcement officers in the impossible position of having to second-guess the medical judgments of emergency room physicians. Police officers like Bornemann and Whealon should not be at risk of liability under § 1983 for medical decisions made exclusively by the emergency room physician. We conclude that the officers' actions under the circumstances presented here did not violate Sullivan's rights under the Fourth Amendment. *See Florida v. Jimeno*, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed.2d 297 (1991) (noting that the "touchstone of the Fourth Amendment is reasonableness").

*Sullivan*, 384 F.3d at 377 (emphasis supplied). The Seventh Circuit also found

Sullivan's due process claim to be

> even less compelling. He relies primarily on *Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), which held that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment. *But* Cruzan, *which dealt with the rights of a person in a persistent vegetative state, has little applicability to these facts.* Moreover, the passage in *Cruzan*

on which Sullivan relies is followed by an important qualification, in which the Court said that "determining that a person has a liberty interest under the Due Process Clause does not end the inquiry; whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 279, 110 S. Ct. 2841. We have already noted that the state has a substantial interest in assuring the medical stability of its pretrial detainees; indeed, were it to be deliberately indifferent to their health, it could be sued under the Fourteenth Amendment. *Allen*, 349 F.3d at 1020. Applying the balancing process envisioned by *Cruzan*, we have little trouble finding that the minimal invasion of his privacy interest here is outweighed by the state's interest.

*Sullivan*, 384 F.3d at 377-78 (emphasis supplied).

District courts in other jurisdictions have reached similar conclusions. *See, e.g., Saulsberry v. Maricopa County*, 151 F. Supp. 2d 1109, 1119 (D. Ariz. 2001) ("Plaintiff has failed to provide, nor has the Court's independent legal research discovered, any case authority that holds an official liable under the Fourth Amendment for forcibly catheterizing a prisoner against his will when the sole purpose of the procedure was medicinal only."), *aff'd sub nom. Saulsberry v. Arpaio*, 41 F. App'x 953 (9th Cir. 2002); *Rubio v. City of New York*, No. 03-CV-1349 (SJ) (KAM), 2005 WL 1072713, at *4 (E.D. N.Y. Apr. 22, 2005) (holding that the plaintiff's Fourth Amendment rights were not violated by officers' decision to transport him to a hospital against his will when he had been shot in the leg and was intoxicated, angry, incoherent, and combative).

Even though the preceding decisions did not directly address Fourth Amendment excessive force claims, they strongly suggest that the *Cruzan* decision would not be extended to hold officers liable for excessive force after restraining a patient for unwanted medical treatment prescribed by medical personnel. Absent any more applicable authority, it would be a vast and unprecedented judicial leap to apply *Cruzan* in the manner suggested by plaintiff. As such, it simply cannot be said that the *Cruzan* decision announced a clearly established legal principle that would have placed defendants on fair notice that their conduct was unlawful.[74]

**b.** *Oliver v. Fiorino*

The second case cited by plaintiff is the Eleventh Circuit's decision in *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009). Because factual precision is essential to the analysis, the entire factual summary from the Court's decision will be set out here:

> Taking the facts in a light most favorable to the plaintiff, this tragic story began on May 13, 2004, at approximately 3:17 p.m. Officer

---

[74] Plaintiff advances two additional contentions that feed on her *Cruzan* argument. First, she argues that the use of a Taser was an unlawful escalation of the officers' initially unlawful use of force in attempting to restrain Nelson. *See* doc. no. 54 (Plaintiff's Brief), at 4 ("Stated another way, the Defendants physically attacked RANDY for his refusal to take medication that he had a constitutional right to refuse. RANDY engaged in self-defense, and Defendants LOTT and MEADOWS attacked him again for doing so.") (capitalization in original). Plaintiff also argues that her son did not refuse to obey any *lawful* orders from officers Lott and Meadaws and, therefore, the officers had no right to use any force. *Id.* ("Defendants . . . knew that their commands to RANDY directing him to consent to the injections were unlawful.") (ellipsis supplied, capitalization in original). Those arguments are not persuasive, because their underlying premise — *i.e.,* that *Cruzan* clearly established that defendants could not exercise any level of force after Nelson's actions manifested his objection to medical treatment — is faulty.

Fiorino was driving her police cruiser; she said she noticed a man, who later turned out to be Anthony Carl Oliver, Sr. ("Oliver"), standing in an eight to ten-foot-wide grassy median on West Colonial Drive near Tampa Avenue in Orlando, waving his arms and attempting to flag her down. Officer Fiorino turned her police cruiser around and parked in the Eastbound turning lane, blocking the turning lane and stopping any traffic in that lane. According to one bystander, Carl Hughley, the officer pulled up and asked Oliver to approach her vehicle. He complied. Oliver then knocked on the rear driver-side window and unsuccessfully attempted to open the locked rear door of the police cruiser. Fiorino used her loud speaker to instruct Oliver to move to the front of her vehicle; again, he complied. Fiorino then directed Oliver to move further away from the vehicle, which he did. Fiorino then exited her vehicle. At this point, Oliver was standing some twenty-three feet away from Fiorino, who was near her vehicle.

Oliver did not speak before Officer Fiorino pulled out her Taser gun and asked Oliver what the problem was. Oliver responded to Fiorino's questions, saying "they're shooting at me" several times, and pointing across the street. Fiorino told Oliver to calm down and tell her what was going on. Oliver attempted to walk away; Fiorino asked him to stay and talk. According to Fiorino, Oliver then began to walk quickly toward her. In response, Fiorino raised her Taser gun and told Oliver to step away from her. Oliver complied. Fiorino observed that throughout this encounter, Oliver was "very fidgety." According to [a bystander-witness named Carl] Hughley, however, Oliver never acted in a threatening or belligerent manner toward the officers, nor did he even curse at them.

Officer Fiorino asked Oliver for details about who was shooting at him and under what circumstances. She also called her dispatch to inquire whether there had been any reported shootings in the area. Dispatch told her there had been a shooting reported eight or nine miles away, but none in her area. When Fiorino was advised there had been no shooting in the area, she requested back-up.

Shortly thereafter, Officer David Burk arrived on the scene. Burk

parked his car so that it, along with Fiorino's car, boxed in the left turning lane where the incident was unfolding. When Burk arrived, Oliver was standing several feet from Fiorino in the median, speaking loudly and "moving his hands around." Fiorino and Burk testified that they considered taking Oliver into custody under Florida's Mental Health Act, Fla. Stat. § 394-463(1) ("the Baker Act"), because he appeared to them to be mentally unstable. Nonetheless, Fiorino and Burk never informed Oliver of this fact, and never attempted to either arrest Oliver or "Baker Act" Oliver at any time during the entire incident.

Officer Burk approached Oliver, who was still standing in the median, to ask him for his name and identification. Oliver complied, giving Burk his identification card. Burk then decided to coax Oliver across the Eastbound side of the street (across the blocked turning lane and the other lanes) to the sidewalk, so that they could talk when he saw there was "no traffic at all," and once the light turned red. Burk attempted to do so by putting his right hand on Oliver's left shoulder. Oliver responded by trying to back away. Oliver then "momentarily stopped" in the blocked turning lane of the street and began to babble incoherently. When the light changed and the traffic (if any) in the other lanes began to move again, Burk tried to force Oliver across the street, but Oliver struggled and pulled away from him.

During the encounter, Burk held on to Oliver's shirt as Oliver attempted to walk away across the street. At this point, Oliver did not try to grab Burk or to swing at him. Fiorino nevertheless, and without warning, tased Oliver for the first time.

Fiorino was using a Taser M26 Electronic 10 Control Device, which was "designed to cause significant, uncontrollable muscle contractions capable of incapacitating even the most focused and aggressive combatants." [Doc. 143–8 at 28]. "The [T]aser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the [T]aser gun by high-voltage insulated wire. When the probes make contact with the target, the [T]aser gun transmits electrical pulses along the wires and into the body of the target, through up to two inches of clothing." *Draper v. Reynolds*, 369 F.3d

1270, 1273 n. 3 (11th Cir. 2004). The pulses are five seconds in duration, unless the trigger is held down longer than five seconds. [Doc. 142–43 at 70]. "Each 5–second cycle is a 'window of opportunity' for the arrest team to apprehend the subject and go hands on." *Id.* at 73.

The Taser prongs from Officer Fiorino's first tase hit Oliver in his abdomen. According to Carl Hughley, this tase brought Oliver to the ground. While the Taser cycled through its five-second shock, Burk tried neither to handcuff Oliver nor to move him. This is so, despite the fact that, according to Hughley, once Oliver was on the pavement after the first tase, he never got back up, and he never hit, kicked, punched, or threatened the officers. Three to four seconds after the first Taser cycle ended, Fiorino tased Oliver once again. Ten seconds after the end of the second cycle, she tased Oliver still again for the third time.

After Oliver was shocked by the Taser, according to [bystander-witness Carl] Hughley, Oliver was lying on the scorching hot asphalt screaming in pain that it was "too hot." Another bystander, Richardra Nelson, said that Oliver remained on the ground while Burk just stood there and watched Fiorino tase him. Both Nelson and Hughley witnessed Oliver attempting to get up from the ground, but said that they never saw him struggling with, hit, kick, punch, or threaten Burk in any manner. Hughley stated that when Oliver went down, he couldn't roll over. When he tried to sit up, he flopped down like a "wet cloth" because he had no control over his body.

After approximately the third or fourth tase, one of the Taser wires became disconnected from the Taser prong and stuck into Oliver's chest. Fiorino loaded a second cartridge into her Taser and began tasing Oliver again. This tase and the next three or four tase cycles caused Oliver to be totally immobilized, leaving him clenched up and lying on his back. After the sixth or seventh tase, Oliver was again seen lying on the hot asphalt. Officer Fiorino said that when she tased Oliver for the last time (the eighth recorded tase), he was lying flat and he did not get up.

Fiorino said she was not sure how many times she tased Oliver, but that she just kept pulling the trigger until he stayed on the ground. She

said that she believed she tased Oliver approximately eleven or twelve times. Fiorino's Taser log shows that she tased Oliver a total of eight times over a two-minute period as follows: (note that each tase lasts five seconds) 1) Tase at 14:18:19 (2:18:19 p.m.); 2) Tase at 14:18:28 (2:18:28 p.m.); 3) Tase at 14:18:43 (2:18:43 p.m.); 4) Tase at 14:19:08 (2:19:08 p.m.); 5) Tase at 14:19:21 (2:19:21 p.m.); 6) Tase at 14:19:31 (2:19:31 p.m.); 7) Tase at 14:19:38 (2:19:38 p.m.); and 8) Tase at 14:20:27 (2:20:27 p.m.).

Nelson observed that once backup arrived at 3:24 p.m., the officers finally handcuffed Oliver. Fiorino stated that after Oliver was handcuffed, he began foaming at the mouth. It appeared as if Oliver's body had gone limp, but he still screamed in pain. After Officer Burk walked Oliver back to the median, Fiorino took some of the Taser prongs out of his body, but was unable to remove them all.

At 3:35 p.m., paramedics arrived on the scene. At that point, Oliver was handcuffed and seated on the median, awake but not talking. After Oliver was placed on a stretcher, Burk noticed that Oliver had blood in his mouth. As Oliver was placed in the ambulance, he sat straight up and began to have a seizure. His health deteriorated rapidly; his body temperature was measured at 107 degrees. Oliver was pronounced dead on June 1, 2004, at Florida Hospital.

An autopsy revealed that Oliver had low levels of cocaine in his system, but Dr. Rudner, Plaintiff's expert witness and forensic pathologist opined "to a reasonable degree of medical certainty" that Oliver died as a result of "ventricular dysrhythmia in conjunction with Rhabdomyolisis" as a result of "being struck by a Taser."

*Oliver*, 586 F.3d at 901-04 (first and seventh alterations supplied, other alterations in original, footnotes omitted).

The Eleventh Circuit held that the officers' actions violated Oliver's clearly established Fourth Amendment right "to be free from excessive force during the

course of a criminal apprehension." *Id.* at 905 (citing *Graham*, 490 U.S. at 394-95; *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005)). Officer Fiorino's single, initial Taser shock of Oliver was reasonable, because Oliver at least arguably placed himself and Officer Burk in some danger when he struggled to free himself from Officer Burk in the street. *Oliver*, 586 F.3d at 906. But the subsequent shocks were not reasonable, considering that the first shock caused Oliver to fall to the ground, and each additional shock only caused him to become further immobilized, to lose control over his body, and to "scream[] in pain while lying on the burning hot pavement." *Id.* (alteration supplied). Moreover, by the time the final shock was administered, Oliver already was lying on his back. *Id.* The Eleventh Circuit further found that:

> The justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal. The plaintiff was not accused of or suspected of any crime, and indeed was not threatened with arrest or apprehension at any time prior to (or after) the use of force. The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle with Officer Burk. He did not act belligerently toward the police officers, and he did not curse or yell at them. In fact, he was largely compliant and cooperative with the officers — moving away from their vehicle when instructed, stopping and talking the first time he was requested to do so (even though not threatened with detainment), stopping when instructed, providing requested identification, and only attempting to disregard the officer and walk away when the officer attempted a "custodial touch" on Oliver's shoulder.
>
> Moreover, the plaintiff did not pose a grave danger to others.

> While Oliver did stop in the street and may have attempted to cross the street against the light, viewing the facts in a light most favorable to Oliver, we may infer that Oliver was within the lane that was boxed in by the police cars, and thus not exposed to traffic during the incident. This inference is supported by Officer Burk's statement that the entire incident occurred in "the safe area," that "none of this incident took place in the middle of the intersection," and that he did not recall any traffic passing by, honking, or almost striking him or Oliver during the incident. Finally, Oliver was not actively resisting arrest nor attempting to evade arrest by flight.

*Oliver*, 586 F.3d at 906-07; *see also Callwood*, 727 F. App'x at 559 (reiterating that the foregoing factual considerations were the basis for holding in *Oliver* that, "despite the lack of fact-specific, on point precedent, 'any reasonable officer would have recognized that his actions were unlawful' because 'the force employed was so utterly disproportionate to the level of force reasonably necessary'") (quoting *Oliver*, 586 F.3d at 908). In summary, the Eleventh Circuit

> agree[d] with the district court's determination that the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful. The need for force was exceedingly limited. Again, Oliver was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee.

> Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff — including tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized — was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the

circumstances. When measured against these facts, the officers violated a clearly established right.

*Oliver*, 586 F.3d at 908 (alteration supplied).

The facts of the *Oliver* case are neither exactly, nor even closely, like those of the current case. Both cases involve a tragic death after the repeated use of a Taser on a mentally disturbed individual, but the similarities end there. It is important to note that the first activation of the Taser in *Oliver* was not determined to have been unlawful, even though Oliver had not disregarded any of the officers' directives or behaved in a threatening or belligerent manner toward them. Oliver only resisted when Officer Burk put his hands on him, to direct Oliver across the street and out of the way of traffic. But, even then, Oliver did not grab or swing at Officer Burk. To justify the initial Taser shock, it was enough that Oliver had placed Officer Burk and himself in some danger by resisting Officer Burk's efforts to steer him out of the street and potential oncoming traffic.

Here, in contrast, before Officer Lott first deployed his Taser, Nelson had disregarded the officers' repeated directives to calm down and allow medical personnel to administer treatment. He had kicked and swung his arms not only at the officers, but also at hospital staff and his own mother. He lunged toward the officers, grunting and thrusting his chest forward in a defiant manner, and he threw a gown and

a vial of medicine toward the officers, actually striking Officer Lott in the face with the medicine. Nelson's size made him an imposing individual.[75] That, together with his aggressive behavior, presented a potential danger to the officers and medical personnel in the room. If anything, there was an even greater need for the initial deployment of a Taser in the present case than there was in *Oliver*. Thus, the *Oliver* opinion does not clearly establish that Officer Lott's *initial use* of his Taser on Nelson amounted to excessive force.

The circumstances leading up to the subsequent Taser deployments against Nelson also were more severe in the present case than they were in *Oliver*. After Oliver was tased for the first time, he attempted to arise from the pavement, but he did not hit, kick, punch, or otherwise threaten the officers. Here, in contrast, after Nelson was tased and fell to the ground, he continued to thrust his arms and legs in an aggressive manner, and he grabbed the cords attached to a piece of medical equipment in an attempt to pull it toward the officers. Only after Officer Lott deployed the Taser a second time was Officer Meadows able to remove the cords from Nelson's grip, and only then were the officers and hospital personnel able to restrain Nelson by injecting sedating medications and applying handcuffs. Thus, Nelson's behavior remained a potential danger to himself and others until *after* the subsequent tasings. Furthermore,

---

[75] *See supra* note 9 for a description of Nelson's height and weight.

even though it is not clear from the video exactly how many times Officer Lott activated his Taser, it would be inconsistent with any reasonable interpretation of the bodycam video to say that it was eight or more times as in *Oliver*; and, Lott did not discharge his Taser at all after Nelson had been fully immobilized with handcuffs and medications.

For all of the reasons discussed above, the conduct of Officers Lott and Meadows was not as extreme and disproportionate as the conduct by the officers in the *Oliver* case. Accordingly, *Oliver* did not provide fair notice that the use of force employed by Lott and Meadows was unlawful. Because plaintiff has failed to satisfy her burden of establishing that defendants violated Nelson's clearly established right to be free from excessive force, defendants are entitled to qualified immunity from suit on plaintiff's Fourth Amendment excessive force claim.

**B.**     **Count II**: *The failure to intervene claim against Officer Meadows*

Defendant Dusty Meadows also is entitled to summary judgment in his favor on Count II of plaintiff's Second Amended Complaint: the contention that he is liable under § 1983 for failing to intervene to prevent Officer Gregg Lott's unconstitutional use of excessive force.

> 90.    "[A]n officer can be liable for failing to intervene when another officer uses excessive force." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether

44

supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]") (alterations in original) (citing Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998)).

91.     Despite having an appreciable opportunity to intervene, Defendant MEADOWS did not explain to Defendant LOTT that he did not have a lawful basis to detain RANDY or to use force against him.

92.     Defendant MEADOWS did not instruct Defendant LOTT to put his TASER away, or physically intervene to protect RANDY from Defendant LOTT.

93.     Despite an appreciable opportunity to intervene, Defendant MEADOWS watched while Defendant LOTT shot the TASER into RANDY'S back and repeatedly cycled the TASER.

Doc. no. 34 (Second Amended Complaint), ¶¶ 90-93, at 19 (alterations and capitalization in original).

Plaintiff correctly observes that a police officer has a duty to intervene to prevent a fellow officer's use of excessive force. *See, e.g., Callwood*, 727 F. App'x. at 560 ("An officer's duty to intervene is triggered when he sees a fellow officer use excessive force."). *Cf. Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996) (finding the officer had no duty to intervene because he "observed no use of excessive force").

On the other hand, when binding caselaw has not clearly established that a police officer's action was an unlawful use of excessive force, no other officer present at the scene has a duty to intervene. *Callwood*, 727 F. App'x. at 560 (citing *Barton*

45

*v. Norrod*, 106 F.3d 1289, 1299 (6th Cir. 1997) (concluding that an observing officer was entitled to qualified immunity because "there was no clearly established right being violated for which [he] had a duty to intervene and protect") (alteration supplied)).   In other words, the failure to intervene claim is dependent upon the excessive force claim.  Here, because plaintiff has not stated an actionable excessive force claim, she also cannot state an actionable claim for Officer Meadows's failure to intervene.

**C.**     **Count VIII**: *Alabama wrongful death claim*

Plaintiff's only remaining claim is for wrongful death under Alabama Code § 6-5-410 (1975).   Jurisdiction over that claim is based upon 28 U.S.C. § 1367, the statute governing supplemental jurisdiction over state law claims.   Specifically, in cases in which a United States District Court's jurisdiction is based upon a federal question, the district court has discretion to entertain state-law claims that are "supplemental" to the federal claims. *See* 28 U.S.C. § 1367(a). The district court may decline to exercise supplemental jurisdiction when:

(1)     the claim raises a novel or complex issue of state law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     *the district court has dismissed all claims over which it has original jurisdiction*, or

46

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (alteration and emphasis supplied).  The Supreme Court added

a gloss to that statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S.

343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id.* at 349-50 (alteration and emphasis supplied) (citing *United Mine Workers of*

*America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all

federal-law claims are eliminated before trial, the balance of factors to be considered

under the pendent [now *supplemental*] jurisdiction doctrine — judicial economy,

convenience, fairness, and comity — will point toward declining to exercise

jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350

n.7 (alterations supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735

F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior

to trial, *Gibbs* strongly encourages *or even requires* dismissal of state claims")

(emphasis supplied).

Here, all of plaintiff's federal claims have been eliminated, and there is no independent basis for this court to assert jurisdiction over plaintiff's state law claim.[76] Accordingly, this court will decline supplemental jurisdiction over the remaining state law claim, and will exercise its discretion to dismiss that claim.

## IV. CONCLUSION

A final judgment in accordance with the foregoing memorandum opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** this 24th day of July, 2018.

_____
United States District Judge

---

[76] Plaintiffs cannot assert federal jurisdiction based on satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332, because complete diversity of citizenship is not present. *See* 28 U.S.C. § 1332(a)(1) (requiring that, in addition to an amount in controversy exceeding $75,000, the civil action must be between "citizens of different States"). Plaintiff and defendants all are citizens of Alabama. *See* doc. no. 34 (Second Amended Complaint), at 4-6.

# ATTACHMENT

**Transcript of Audio Statements Recorded on the Body Camera Worn by
Athens, Alabama Police Officer Dusty Meadows**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION


DOROTHY NELSON, *individually*    *
*and as the Administrator Ad*     *
*Litem of the Estate of Randy*    *
*Nelson*,                         *
      Plaintiff,            *    5:18-cv-00059-CLS
                *    February 3, 2016
      vs.                   *
                *
GREGG LOTT, et al.,               *
      Defendants.           *
*****************************


TRANSCRIPT OF AUDIO STATEMENTS RECORDED ON THE BODY CAM WORN
BY ATHENS, ALABAMA POLICE OFFICER DUSTY MEADOWS
(Notice of Conventional Filing Attached to Document 25)

(01:46)  UNIDENTIFIED MALE NURSE:  We're going to give him some Geodon and Ativan to calm him down.

UNIDENTIFIED OFFICER:  Okay.

UNIDENTIFIED MALE NURSE:  It's more than we can handle to hold him.  And I just need a strong mind -- I mean, a strong back and weak mind.

OFFICER MEADOWS:  Weak mind, strong back.

UNIDENTIFIED MALE NURSE:  And this is going to go in the top of his leg.  We've got two shots to give him (inaudible).

OFFICER MEADOWS:  What's going on, man?  You okay?  He's going to give you some medicine to make you feel better, all right?

UNIDENTIFIED MALE NURSE:  Climb back up here in the bed.

OFFICER MEADOWS:  Just lay down.  They're going to take good care of you, okay?  Yeah, buddy.

UNIDENTIFIED MALE NURSE:  We going to give you some stuff.  There you go.

OFFICER MEADOWS:  Like the matrix there for a minute.

Just chill out, okay?

UNIDENTIFIED FEMALE:  Come on.

OFFICER MEADOWS:  Chill out.

(Inaudible.)

UNIDENTIFIED OFFICER:  Let him go.  Let him go.  Let him go.  Relax.  Relax.  Let him go.

UNIDENTIFIED OFFICER:  Watch out.  Watch out.  I got the Taser out.

00:02:54    OFFICER LOTT:  Stop.

OFFICER MEADOWS:  Stop.

OFFICER LOTT:  Stop.  I need you to --

PATIENT'S MOM:  You come back over here.  You come over here, now.

00:03:02    OFFICER LOTT:  Stop.  Stop.  Calm down.

MS. NELSON:  He ain't never acted like that before.  Okay.

OFFICER LOTT:  Are you his wife?

MS. NELSON:  Mom.

00:03:10    OFFICER LOTT:  Mom, I'm going to have to tase him and I don't want to, but I'm going to have to, okay?

MS. NELSON:  Okay.

OFFICER LOT:  There's no other way of doing this.

MS. NELSON:  Okay.

00:03:18    OFFICER MEADOWS:  Chill out.  Just relax.  Relax.  Relax, man.  Just chill out, okay?  We're trying to help you, okay?  We're just trying to help you, buddy.  We ain't trying to hurt you.

OFFICER LOTT:  112 go ahead be in route.

00:03:38    OFFICER MEADOWS:  Just relax, okay?  Just relax.

OFFICER LOTT:  Stop.  Turn around.  Turn around.
Turn around.

OFFICER MEADOWS:  Just relax, okay?

OFFICER LOTT:  Put your hands behind your back.

00:03:56  OFFICER MEADOWS:  Put your hands behind your back.

OFFICER LOTT:  Put your hands behind your back.

OFFICER MEADOWS:  Turn over.  Turn over.  Turn over.
Turn over.  Turn over.  Relax.  Relax.

OFFICER LOTT:  I'm going to have to keep
00:04:13  (inaudible).

OFFICER MEADOWS:  Get this out of the way.  Turn
over.

OFFICER LOTT:  Turn over.

OFFICER MEADOWS:  Turn over.  Turn over.  Turn over.
00:04:23  Turn over.  Come on.

UNIDENTIFIED MALE:  I got him.

UNIDENTIFIED MALE NURSE:  Can we touch him yet?

OFFICER LOTT:  No.  Roll him over.

OFFICER MEADOWS:  Roll over.  Roll over.

00:05:00  OFFICER LOTT:  Come my way, y'all.

UNIDENTIFIED FEMALE:  All right.  I got his medicine
in.

OFFICER MEADOWS:  Roll over.  Roll over.

UNIDENTIFIED FEMALE:  It's rolling.

00:05:11  OFFICER LOTT:  I got it.  (Inaudible).  Thank you.

UNIDENTIFIED FEMALE: (Inaudible) slide him right (inaudible) sitting on a probe (inaudible).

UNIDENTIFIED MALE: I got it. Thank you.

UNIDENTIFIED OFFICER: Bring your legs --

00:06:08 OFFICER MEADOWS: Relax.

UNIDENTIFIED OFFICER: Taser's off.

(INAUDIBLE BACKGROUND TALKING.)

UNIDENTIFIED OFFICER: Relax.

UNIDENTIFIED MALE NURSE: This Taser's going to need
00:06:10 to come out. Tell me when you want them out.

OFFICER LOTT: Get them out. Pull them up. Just
pull them straight up.

    I tell you what. Just hold onto them. Grounded to his
foot, all right? I dealt (inaudible) pull and hold onto them
00:06:29 for me. Hold onto them. Hold onto that one. Hold on tight.

OFFICER LOTT: You give him a little wire in there
(inaudible).

OFFICER MEADOWS: Relax.

UNIDENTIFIED FEMALE NURSE: You want to get some
00:06:48 restraints to tie his ankles together?

UNIDENTIFIED MALE NURSE: We are going to need to
restrain him. But what we going to do, we need a board to
get him up on the bed.

UNIDENTIFIED MALE: And then we need to grab it.
00:07:00 And then instead of (inaudible) get him out of the cuffs.

UNIDENTIFIED FEMALE NURSE:  I guess we could board him, board him and then (inaudible).

UNIDENTIFIED MALE NURSE:  We're going to have to board him to pick him up.  He's too big to pick up.  We can hold him and get him -- we can bounce him on the board.

OFFICER MEADOWS:  He needs a Band-aid or something right here where this dart was in him.

I'm bleeding, too.

UNIDENTIFIED MALE NURSE:  Did he hit his head when he went down?

UNIDENTIFIED OFFICER:  Yeah.  Close to the sink here.

OFFICER MEADOWS:  I don't think he noticed, though.  He --

(INAUDIBLE BACKGROUND TALKING)

UNIDENTIFIED FEMALE NURSE:  All right.  We have got a board.

UNIDENTIFIED MALE:  I'm sorry.  I apologize.

UNIDENTIFIED FEMALE NURSE:  I ain't never seen anybody get Tasered before.  That was an excitement.

UNIDENTIFIED OFFICER:  It usually hits me.  Don't forget to put a Band-aid on that.  Two small areas.

Chill on out.

Can you document the (inaudible).

OFFICER MEADOWS:  Yeah, I got it.

UNIDENTIFIED MALE:  He said he hit his head -- it probably did.  We (inaudible).

He probably hit his head --

UNIDENTIFIED FEMALE NURSE:  We going to get the board and put him on the board?

UNIDENTIFIED MALE NURSE:  Yeah.  I just kind of want to protect his shoulder here.

OFFICER MEADOWS:  Is he breathing?  He's kind of blue right now.

(INAUDIBLE.)

OFFICER MEADOWS:  He was taking some short breaths there.

UNIDENTIFIED FEMALE NURSE:  Great.  Now we're going to intubate him.

OFFICER LOTT:  Yeah, we (inaudible) see what it's just about.

UNIDENTIFIED OFFICER:  You get him up on the bed. You got him.

UNIDENTIFIED FEMALE NURSE:  I was trying to get the straps out from under him and just strap him over here.

UNIDENTIFIED MALE NURSE:  Bring that bed closer, put the head down.

UNIDENTIFIED FEMALE NURSE:  His hips are (inaudible).

OFFICER MEADOWS:  All right.

1    UNIDENTIFIED MALE NURSE:  (Inaudible) locked?

2    UNIDENTIFIED FEMALE NURSE:  Hey, guys, we need the

3 bed out.

4    OFFICER MEADOWS:  He's not breathing real good right

5 now, mom.

6    MS. NELSON:  Oh, no.  No.

7    (END.)

00:10:33

<u>CERTIFICATE</u>

    I certify that the foregoing is a correct transcript from the audio/video recording in the above-entitled matter transcribed to the best of my ability.

*Christina K Decker*

_____       <u>07-09-18</u>

Christina K. Decker, RMR, CRR       Date

Federal Official Court Reporter

ACCR#:  255